THE STATE OF OHIO, APPELLEE, *v.* JACKSON, APPELLANT.

[Cite as *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981.]

(No. 2002–1604—Submitted March 30, 2005—Decided November 23, 2005.)

APPEAL from the Court of Common Pleas of Allen County, No. CR2002–0011.

———————

MOYER, C.J.

{¶ 1} On January 3, 2002, in Lima, Ohio, defendant-appellant, Cleveland Jackson Jr., and his half-brother, Jeronique Cunningham, robbed a group of eight people and then fired their weapons into the group from close range. Three-year-old Jayla Grant and 17–year–old Leneshia Williams both died as a result of gunshot wounds. A jury convicted appellant of the aggravated murders of Jayla and Leneshia and sentenced him to death.

## I. Facts and Case History

{¶ 2} On the afternoon of January 3, 2002, Tara Cunningham, appellant's half-sister and Jeronique's sister, saw appellant and Jeronique in her bedroom with a gun. According to Tara, Jeronique was wiping off the gun, and appellant was wiping off the clip, which had bullets in it. Tara heard appellant tell Jeronique that he was going to rob somebody and heard appellant mention LaShane ("Shane") Liles. Earlier that afternoon, Shane had sold Jeronique crack cocaine at Shane's apartment.

{¶ 3} In the evening of January 3, appellant and Jeronique went to Shane's apartment in Lima, Ohio. When appellant and Jeronique arrived, Shane was not home, but several of his relatives and friends were there. Shane returned to his apartment shortly thereafter, and he and appellant discussed a drug transaction. While Shane and appellant talked on the staircase near the living room, Jeronique sat in the living room and watched a movie with teenagers Coron Liles, Dwight Goodloe Jr., and Leneshia Williams.

{¶ 4} As Shane and appellant continued to talk, Jeronique stood up and ordered Coron, Dwight, and Leneshia into the kitchen. When they did not immediately obey, Jeronique pulled out a gun and struck Coron in the face with the barrel, breaking his jaw. When Jeronique hit Coron, appellant drew his gun and aimed it at Shane.

{¶ 5} Appellant forced Shane upstairs and robbed him of money and drugs. Appellant then tied Shane's hands behind his back and forced him into the kitchen at gunpoint. In the kitchen, Jeronique was holding at gunpoint Coron, Dwight, Leneshia, Armetta Robinson, Tomeaka and James Grant, and James's three-year-old daughter, Jayla.

{¶ 6} After appellant forced Shane into the kitchen, he asked Shane for the rest of the money. When Shane said that he had given him all he had, appellant shot him in the back. Appellant and Jeronique then fired their weapons at the others. Once the shooting stopped, the victims heard clicking sounds, as appellant and Jeronique continued pulling the triggers even after they were out of bullets. Appellant and Jeronique left the kitchen, and James Grant heard appellant say, "We have to make sure nobody in there is moving."

{¶ 7} The deputy coroner determined that Jayla and Leneshia had both been killed by gunshot wounds to the head. Jayla was shot twice in the head: once above the right ear and once behind the right ear. Both bullets exited Jayla's head. Leneshia suffered a gunshot wound to the back of her head, and she died almost instantly. The coroner recovered no bullets or bullet fragments from the victims during the autopsies and could not determine the caliber of the bullets that had caused the deaths.

{¶ 8} The surviving victims all suffered gunshot injuries as well. Shane had been shot in the back, and the bullet had exited through the left side of his chest. Armetta had been shot in the head and was in a coma for several weeks. James had been shot five times and had sustained injuries to his head, arm, and hand. Tomeaka had been shot in the head and arm and had lost her left eye. Coron had been shot in the face, which knocked out some of his teeth and caused other injuries to his mouth. A bullet had grazed Dwight's side, fracturing a rib.

{¶ 9} Police found eight spent shell casings, five spent bullets, and one fragment of lead core from a full-metal-jacketed bullet at the scene. When Tomeaka testified at trial, one bullet was still lodged in her arm. Coron testified that he had spat a bullet from his mouth outside the apartment, but police never found that bullet.

{¶ 10} John Heile, a firearms expert for the Bureau of Criminal Identification and Investigation, tested the casings and bullets and identified all but one shell casing as .380–caliber automatic-weapon ammunition. Thus, Heile established that one of the weapons used in the shootings was a .380 automatic pistol. Heile also determined that state's exhibits 10 through 17 (shell casings) and 18, 19, 21, and 23 (spent bullets), were all fired from the same .380 automatic pistol. One spent bullet and the core fragment did not have enough markings on them to determine whether they had been fired from the same weapon as the other bullets and casings. No guns were recovered, but the victims testified that appellant had fired a black automatic handgun with a clip and that Jeronique had fired a larger, silver revolver.

{¶ 11} Appellant was indicted on two counts of aggravated murder. Count One charged appellant with purposely causing the death of Jayla Grant during an aggravated robbery. R.C. 2903.01(B). Count Two charged appellant with purposely causing the death of Leneshia Williams during an aggravated robbery. R.C. 2903.01(B). Appellant was charged with aggravated robbery (R.C. 2911.01(A)(1)) in Count Three and with six counts of attempted aggravated murder (R.C. 2923.02(A) and 2903.01(B)) in Counts Four through Nine.

{¶ 12} The aggravated-murder counts each contained two death-penalty specifications. The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons. R.C. 2929.04(A)(5). The second specification charged aggravated murder during an aggravated robbery and alleged that the murder was committed with prior calculation and design. R.C. 2929.04(A)(7). Firearm specifications were attached to all counts.

{¶ 13} At trial, Officer David Parker testified as a defense witness. Parker, who had assisted in photographing and videotaping the crime scene, identified defense's exhibit CC, a videotape of the crime scene. The defense then played the videotape for the jury.

{¶ 14} Appellant also testified at trial. According to appellant, on January 3, 2002, he and Jeronique had planned to rob a drug dealer (not Shane), but their plan had not been carried out.

{¶ 15} Appellant said that he later took Jeronique to pick up a gun. After another discussion about robbing the drug dealer, Jeronique suggested that he and appellant go to Shane's apartment so appellant could pick up some crack cocaine for their sister, Tara. When appellant and Jeronique arrived, Shane was not home. Appellant told Jeronique that they should leave, but Jeronique insisted that they wait for Shane. According to appellant, he and Jeronique had not discussed robbing Shane.

{¶ 16} Appellant testified that after Shane came home, Shane gave appellant a bag of crack cocaine for Tara. Shane tried to sell more drugs to appellant, but appellant was not interested. At that point, Jeronique pulled out a gun and ordered Coron, Dwight, and Leneshia into the kitchen. Dwight and Leneshia immediately ran into the kitchen, but when Coron did not move fast enough, Jeronique hit him in the mouth with his gun.

{¶ 17} Appellant said that when Jeronique struck Coron, Shane jumped up from the stairs and appellant "got scared" and pulled his gun out. After Jeronique went into the kitchen, appellant talked with Shane on the stairs. At trial, appellant denied that he had pointed his gun at Shane while they talked on the stairs. Appellant said that Jeronique had then come out of the kitchen and robbed Shane of money that Shane had hidden in his sock. Jeronique then returned to the kitchen, and appellant remained at the bottom of the stairs while Shane went upstairs alone. When Jeronique found out that appellant was not with Shane, Jeronique pointed his gun at appellant and ordered him to go after Shane.

{¶ 18} Appellant went upstairs, where Shane offered him an ounce of cocaine to get Jeronique out of the house. Appellant agreed to get Jeronique out of the house for three ounces of cocaine. Shane gave appellant the drugs, and he and Shane went downstairs. At trial, appellant denied that he had forced Shane downstairs and said that Shane had agreed to have his hands tied together so that Jeronique would think that appellant had robbed Shane.

{¶ 19} According to appellant, when appellant and Shane went into the kitchen, Jeronique asked appellant how much money Shane had. Appellant told Jeronique that Shane did not have any more money but that appellant had Shane's drugs. James Grant then called appellant and Jeronique punks and told them to leave. Jeronique pointed his gun at James's head and pulled the trigger, but the gun did not fire. Appellant said that after the third click of Jeronique's gun, appellant's own gun accidentally went off, shooting Shane. Appellant then allegedly suggested to Jeronique that they leave, but Jeronique said that he was

not going to leave any witnesses. Appellant said that as he had turned to leave, Jeronique "put his hand politely around the barrel of [appellant's] three-eighty," and appellant let Jeronique have the gun and ran out the front door.

{¶ 20} Appellant said that he had heard one gunshot as he ran down an alley near Shane's apartment. Eventually, appellant met up with Jeronique at their car, and they fled the scene together. Appellant testified that Shane was the only person he shot and that he did not find out until later that others had been shot.

{¶ 21} The jury convicted appellant of all charges and specifications. After a penalty hearing, the trial court sentenced appellant to death on both Counts One and Two, consistent with the jury's recommendation. The trial court imposed consecutive sentences of ten years each for appellant's convictions for aggravated robbery and six counts of attempted aggravated murder, plus a three-year consecutive sentence for the firearm specifications.

{¶ 22} The cause is now before this court upon an appeal as of right.

{¶ 23} Appellant has raised 12 propositions of law. We have reviewed each and determined that none justifies reversal of appellant's convictions and therefore affirm his convictions.

{¶ 24} We find, however, that the trial court abused its discretion in denying appellant's request to inform prospective jurors that one of the murder victims was a young child. Accordingly, we vacate appellant's death sentence for Count One (murder of Jayla Grant) and remand the cause to the trial court for resentencing on that count only.

{¶ 25} Pursuant to R.C. 2929.05(A), we have independently weighed the aggravating circumstance against the mitigating factors and have reviewed the death penalty for the aggravated murder of Leneshia Williams for appropriateness and proportionality. We find that the aggravating circumstance in Count Two outweighs the mitigating factors beyond a reasonable doubt. Accordingly, we affirm appellant's sentence of death for the aggravated murder of Leneshia Williams.

## II. Pretrial/Voir Dire Issues

{¶ 26} In his revised first proposition of law, appellant claims that several errors occurred during jury selection.

### A. Prejudicial Publicity

{¶ 27} Appellant claims that due to the trial court's restrictions, the voir dire inadequately addressed the impact of pretrial publicity on prospective jurors. Appellant argues that the extent of pretrial publicity and the number of prospective jurors who knew about the crime demanded that a comprehensive voir dire

examination be conducted. Appellant filed a motion for a change of venue before trial. The trial court denied the motion after voir dire was completed.

{¶ 28} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. A trial court has " 'great latitude in deciding what questions should be asked on voir dire.' " *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493. Crim.R. 24(A) requires that counsel be given an opportunity to question prospective jurors or to supplement the court's voir dire examination. Accord R.C. 2945.27. But restrictions on voir dire have generally been upheld. Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire. *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674; *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274.

{¶ 29} Despite appellant's assertions to the contrary, the portion of the voir dire focusing on pretrial publicity was adequate. The voir dire in this case was not cursory: it lasted five days and covered nearly 1,300 pages of transcript. Prospective jurors also completed an extensive juror questionnaire, and the trial court repeatedly advised jurors to avoid media coverage about the case.

{¶ 30} The trial court individually questioned prospective jurors in sequestered sessions and asked each prospective juror whether he or she knew about the case from either media coverage or other sources. Nearly every prospective juror acknowledged some familiarity with the case. The court, as well as counsel, also individually questioned prospective jurors regarding the source of their knowledge of the case, whether they had formed any fixed opinions regarding appellant's guilt or innocence because of their exposure to pretrial publicity, whether they could decide the case solely on the evidence presented at trial, and whether they could deliberate in a fair and impartial manner. Following thorough questioning, the trial court readily excused members of the venire who had formed fixed opinions due to pretrial publicity or were otherwise unsuitable.

{¶ 31} Appellant, however, complains that he was unfairly prohibited from inquiring into the content of what prospective jurors had heard from media accounts of his case, as well as media coverage of the trial of appellant's accomplice, Jeronique Cunningham. But a criminal defendant does not have a constitutional right to question prospective jurors about the contents of media reports that they have been exposed to. *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493. The voir dire is sufficient if it shows that jurors will be able to set aside any impression they have formed because of pretrial publicity and decide the case solely on the law and evidence presented at trial. *State v. Spirko* (1991), 59 Ohio St.3d 1, 23–24, 570 N.E.2d 229; *Patton v. Yount* (1984), 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847. Here, every empaneled

juror stated either that he or she had formed no opinions based on pretrial publicity or that, if he or she had, he or she could set aside those opinions and render a fair and impartial verdict. See, e.g., *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30. Thus, the trial court took effective steps to protect appellant's rights, and appellant has not proven that his jury was impaired by pretrial publicity. See, e.g., *State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30–31.

{¶ 32} Finally, defense counsel waived any potential error by failing to challenge any seated juror about prejudicial publicity. See *State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668, citing *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated in part on other grounds by *Williams v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. A juror who is not challenged for cause is presumed to be impartial. *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682.

## B. Standard for Excusing Jurors

{¶ 33} Appellant next argues that the trial court erred in applying the standard set forth in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, instead of the standard in R.C. 2945.25(C), in excusing prospective jurors who expressed reservations about capital punishment. However, the *Witt* standard is the correct standard for determining when a prospective juror may be excluded for cause based on his or her opposition to the death penalty. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated on other grounds by *Rogers v. Ohio* (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452; *State v. Beuke*, 38 Ohio St.3d at 38, 526 N.E.2d 274.

## C. Examination of Death–Penalty–Opposed Jurors

{¶ 34} Appellant asserts that the trial court erred when it denied defense counsel an opportunity to rehabilitate prospective jurors who said that they opposed the death penalty. The trial court dismissed prospective jurors Nos. 222, 228, 300, and 301 without giving defense counsel an opportunity to inquire into their views on capital punishment. Although it might have been preferable for the trial court to permit defense counsel to question these jurors, the trial court did not abuse its discretion. Each juror unequivocally stated that he or she could not fairly consider imposing the death penalty. Thus, in each instance, there was a sufficient basis to support the trial court's decision. See *State v. Spirko*, 59 Ohio St.3d at 22, 570 N.E.2d 229; *State v. Huertas* (1990), 51 Ohio St.3d 22, 29–30, 553 N.E.2d 1058.

### D. Voir Dire of "Automatic"–Death–Penalty Jurors

{¶ 35} Appellant contends that the trial court refused to allow defense counsel to fully examine prospective jurors who said that they were willing to impose the death penalty regarding their ability to fairly consider mitigating evidence and all available sentencing options. As a result, he claims, his jury may have contained jurors who automatically voted for the death penalty upon his conviction for aggravated murder.

{¶ 36} Appellant's claim is not supported by the record. Defense counsel were given extensive leeway to examine prospective jurors regarding their willingness to consider mitigating evidence and impose a life sentence. Defense counsel were permitted to ask questions aimed at gauging each prospective juror's receptiveness to potentially mitigating evidence (e.g., evidence of appellant's deprived childhood and psychiatric testimony). In addition to questioning whether jurors would follow the court's instructions and fairly consider all sentencing options, defense counsel were also permitted to ask jurors about their views on capital punishment, including their best arguments for and against the death penalty. Defense counsel were also allowed to question prospective jurors on other topics, including jurors' views about race, religion, illegal drugs, and the criminal-justice system.

{¶ 37} Notwithstanding the leeway given his counsel, appellant argues that the trial court's limitations prevented him from successfully challenging for cause those jurors who were inclined to impose the death penalty in every murder case. He identifies prospective jurors Nos. 230, 263, 291 and prospective juror No. 299 (who actually sat on his jury) and claims that if the trial court had excused these prospective jurors for cause, he would have been able to use his peremptory challenges differently.

{¶ 38} A prospective juror in a capital case may be excused for cause if his views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. A trial court's ruling on a challenge for cause will not be overturned on appeal "unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion." *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646; accord *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

{¶ 39} Appellant failed to challenge prospective juror No. 263 and waived any alleged error in regard to this prospective juror. See *State v. Smith*, 80 Ohio St.3d at 105, 684 N.E.2d 668, citing *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. In addition, appellant

exercised peremptory challenges as to prospective jurors Nos. 230, 263, and 291. Thus, only prospective juror No. 299 actually sat on appellant's jury.

{¶ 40} The trial court did not abuse its discretion by not excusing these prospective jurors for cause. All four prospective jurors stated that they would not automatically vote for the death penalty, that they could follow the court's instructions, and that they would fairly consider mitigating evidence. A trial court does not abuse its discretion in denying a challenge for cause if a juror, even one predisposed in favor of imposing death, states that he or she will follow the law and the court's instructions. *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d 329; *State v. Treesh* (2001), 90 Ohio St.3d 460, 468, 739 N.E.2d 749. Deference must be paid to the trial judge who sees and hears the juror. *Wainwright v. Witt*, 469 U.S. at 425–426, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Williams*, 79 Ohio St.3d at 8, 679 N.E.2d 646.

{¶ 41} Appellant also contends that the trial court unduly restricted voir dire by precluding defense counsel from questioning prospective jurors concerning their views about imposing the death penalty on a person who is convicted of killing a three-year-old child. Appellant bases this claim on the following events.

{¶ 42} During individual voir dire, after six prospective jurors had been questioned, including four who eventually were seated as jurors, defense counsel requested that the trial court inform prospective jurors that one murder victim was three years old and allow the defense to question prospective jurors about that fact to reveal any bias toward imposing the death penalty. At the time this issue was raised, the trial court had not informed the venire that one murder victim was three years old. Nor did the court inform any of the remaining prospective jurors of this fact.

{¶ 43} The trial court rejected defense counsel's request and would not permit counsel to discuss the ages of the murder victims with the venire. The judge believed that "the death penalty qualification process should be in the abstract" and that voir dire concerned only whether prospective jurors, "without knowing the specifics of the case, * * * can keep an open mind on penalty determinations."

{¶ 44} After another 15 prospective jurors had been individually questioned, including three who eventually became jurors, defense counsel again asked to examine prospective jurors about their views on imposing the death penalty on child murderers.

{¶ 45} The trial court denied defense counsel's second request, ruling that a defendant is not entitled to question prospective jurors on the specifics of the case. The trial court reiterated that voir dire should be conducted in the abstract and further noted that it viewed defense counsel's request to question prospective jurors about specific facts as an attempt " 'to predispose jurors to react a certain

way to anticipated evidence,'" quoting *Missouri v. Clark* (Mo.1998), 981 S.W.2d 143, 147.

{¶ 46} Defense counsel then moved for a mistrial on the basis that they had been precluded from making an inquiry on this subject. The trial court denied the motion.

{¶ 47} On appeal, appellant claims that the trial court's refusal to tell prospective jurors that one of the murder victims was three years old prevented him from discovering a bias on the part of prospective jurors. Due to this restriction, appellant argues that he was unable to develop and exercise challenges for cause and peremptory strikes against prospective jurors who could not fairly consider mitigation or a life sentence.

{¶ 48} Crim.R. 24 and R.C. 2945.27 afford both the prosecution and defense the opportunity to conduct reasonable voir dire of prospective jurors. Nevertheless, the scope of voir dire falls within the trial court's sound discretion and varies depending on the circumstances of a given case. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40, citing *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. While restrictions on voir dire have generally been upheld, any limits on voir dire must be reasonable. *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 31. We will not find prejudicial error in a trial court's qualification of venirepersons as fair and impartial jurors unless appellant can show a clear abuse of discretion. *State v. Cornwell* (1999), 86 Ohio St.3d 560, 565, 715 N.E.2d 1144. A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40.

{¶ 49} We conclude that the trial court's limitation on voir dire in this case was an abuse of discretion. The trial court erred when it held that appellant was not entitled to have prospective jurors informed that one of the murder victims was three years old. While fairness requires that jurors be impartial, prospective jurors need not be totally ignorant of the facts and issues involved to be qualified as jurors. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 38, citing *State v. Sheppard* (1998), 84 Ohio St.3d 230, 235, 703 N.E.2d 286; *Murphy v. Florida* (1975), 421 U.S. 794, 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589.

{¶ 50} The trial court cited *State v. Lundgren*, 73 Ohio St.3d 474, 653 N.E.2d 304, for the principle that voir dire should be conducted in the abstract. *Lundgren*, however, does not stand for this broad proposition. In *Lundgren*, the defense counsel wanted to ask prospective jurors whether they would consider specifically identified mitigating factors. Id. at 481, 653 N.E.2d 304. The trial court denied the request, ruling that "such questions constituted juror 'indoctri-

nation,' " but did allow counsel to ask prospective jurors generally whether they would consider mitigating factors as instructed. Id. We held that the trial court had exercised appropriate discretion. Id.

{¶ 51} Moreover, in *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576, we rejected the argument that it was improper to outline the facts of the case during voir dire. In *Tyler*, the prosecutor told several veniremen that the victim was an elderly man who sold fruits and vegetables, the location of his produce stand, and that he had been robbed and shot to death. We held that in examining prospective jurors the state had the right to state the nature of the alleged offense in order to determine whether the jurors had read about the crime. *Tyler*, 50 Ohio St.3d at 32, 553 N.E.2d 576.

{¶ 52} In this case, the trial judge misconstrued defense counsel's request to inform the prospective jurors of Jayla's age as an attempt " 'to predispose jurors to react a certain way to anticipated evidence,' " quoting *Missouri v. Clark*, 981 S.W.2d 143, 147. Counsel were merely attempting to discover whether prospective jurors could fairly consider imposition of a life sentence in a case involving a three-year-old murder victim. While it is improper for counsel to seek a commitment from prospective jurors on whether they would find specific evidence mitigating, *State v. Bedford*, 39 Ohio St.3d at 129, 529 N.E.2d 913, counsel should be permitted to present uncontested facts to the venire directed at revealing prospective jurors' biases. *Turner v. Murray* (1986), 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27.

{¶ 53} Even without being informed that one of the victims in this case was a child, some members of the venire indicated a possible bias in favor of imposing the death penalty on murderers of children. For example, prospective juror No. 257 stated on her juror questionnaire that she had "conflicting feelings" regarding capital punishment: "Catholicism teaches that I shouldn't sit in judgment. However, many violent criminals probably deserve to die, especially those who commit crimes against children." During voir dire, she confirmed that her opinion had not changed.

{¶ 54} Prospective juror No. 282 stated that she considered crimes against children and the elderly to be the most serious crimes because persons in those groups are "closer to my heart than anybody." She also explained that in her opinion, people convicted of crimes against children and the elderly are not punished as severely as they ought to be.

{¶ 55} Prospective juror No. 288 stated on her questionnaire and during voir dire that she believed that the death penalty is a proper remedy when a murder is premeditated, when the defendant showed no remorse, or when the victim was a child.

{¶ 56} "The Constitution * * * does not dictate a catechism for *voir dire,* but only that the defendant be afforded a fair and impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Wilson,* 74 Ohio St.3d at 386, 659 N.E.2d 292. "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales–Lopez v. United States* (1981), 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22. Accordingly, the exercise of the trial court's discretion to restrict inquiry by counsel is subject to the essential demands of fairness. *Morgan,* 504 U.S. at 730, 112 S.Ct. 2222, 119 L.Ed.2d 492, citing *Aldridge v. United States* (1931), 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054.

{¶ 57} Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors. *Morgan,* 504 U.S. at 734–735, 112 S.Ct. 2222, 119 L.Ed.2d 492. Moreover, the fact that defendant bears the burden of establishing juror partiality, see *Wainwright v. Witt,* 469 U.S. at 423, 105 S.Ct. 844, 83 L.Ed.2d 841, makes it all the more imperative that a defendant be entitled to meaningful examination at voir dire in order to elicit potential biases held by prospective jurors. *Mu'Min v. Virginia,* 500 U.S. at 441, 111 S.Ct. 1899, 114 L.Ed.2d 493 (Marshall, J., dissenting).

{¶ 58} The trial court here was on notice that some prospective jurors harbored a strong bias in favor of imposing death for murderers of children. If an issue of bias surfaces before trial, it is the trial court's responsibility to conduct an adequate inquiry. *Oswald v. Bertrand* (C.A.7, 2004), 374 F.3d 475, 484. See, also, *United States v. Barber* (C.A.4, 1996), 80 F.3d 964, 968 (an inquiry is required during voir dire to eliminate prejudice that threatens the fairness of the process or the result). The greater the probability of bias, "the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." *Oswald v. Bertrand,* 374 F.3d at 480.

{¶ 59} At a minimum, the trial court should have granted defense counsel's request to inform the venire that one murder victim was a three-year-old child. If the prospective jurors had been aware of this fact when they were asked general questions of fairness and impartiality, they may well have been prompted to admit to a predisposition to recommend the death penalty for those who murder children. However, without knowledge of this fact, prospective jurors could respond truthfully to general questions of fairness and impartiality while the specific concern was left unprobed.

{¶ 60} In this case, appellant was charged with killing a three-year-old child. "[I]t is in just these circumstances, when the crime itself is likely to inflame the passions of jurors, that courts must be vigilant in ensuring that the demands of due process are met." *McKenzie v. Smith* (C.A.6, 2003), 326 F.3d 721, 727–728 (case involving brutal assault on three-year-old child). Protecting children from harm is a common human characteristic, and many people harbor strong feelings and emotions whenever a child is a victim of a violent crime. Some prospective jurors, when presented with this fact, may have been unable to remain dispassionate and impartial when deciding whether the death sentence should be imposed. The possibility that one juror might not have fairly considered sentencing options and may have voted for the death penalty solely because appellant murdered a three-year-old child is a risk too great to ignore. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222, 119 L.Ed.2d 492. Therefore, we find that due process required that defense counsel be allowed to determine whether any members of the venire harbored prejudices regarding this fact in order to exercise their challenges intelligently.

{¶ 61} We hold that in a death-penalty case involving the murder of a young child the defendant is entitled, upon request, to have the prospective jurors informed of that fact and to ask questions that seek to reveal bias. The trial court retains its discretion as to the form and number of questions on the subject, including whether to question the prospective jurors individually or collectively. See *State v. Wilson*, 74 Ohio St.3d at 386, 659 N.E.2d 292; *Ham v. South Carolina*, 409 U.S. at 527, 93 S.Ct. 848, 35 L.Ed.2d 46.

{¶ 62} The trial court abused its discretion by refusing defense counsel's requests to advise prospective jurors that one of the murdered victims was a three-year-old child and by refusing to allow voir dire on that fact. Therefore, the death sentence imposed on appellant in Count I for the aggravated murder of Jayla Grant is vacated. The matter is remanded to the trial court for resentencing consistent with R.C. 2929.06. Our disposition of this issue does not affect the separate death sentence imposed on Jackson for the death of Leneshia Williams.

### E. Improper Selection of Venire

{¶ 63} Appellant asserts that his convictions and death sentence are infirm because the petit-jury venire, grand-jury venire, and grand-jury foreperson were improperly selected. He argues that the use of voter-registration lists for jury selection resulted in a significant underrepresentation of African–Americans.

{¶ 64} The Sixth Amendment to the United States Constitution does not require that petit juries "mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690. However, the method employed for selecting the

groups from which juries are drawn "must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id.

{¶ 65} In order to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement, a defendant must demonstrate "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579. Accord *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus.

{¶ 66} For purposes of fair-cross-section analysis, African–Americans are a distinctive group. *State v. Jones* (2001), 91 Ohio St.3d 335, 340, 744 N.E.2d 1163. However, with respect to the second prong of the *Duren* test, appellant has not proven that African–Americans in Allen County are unfairly represented in venires relative to their numbers in the community. In fact, appellant's trial counsel conceded that they had no evidence to support their claim that Allen County juries have traditionally been void of African–Americans.

{¶ 67} Appellant also cannot satisfy the third prong of *Duren,* because he has not presented any evidence of systematic exclusion of African–Americans. Before trial, defense counsel extensively questioned employees of the Allen County Board of Elections and two county jury commissioners on the process used to compile the voter-registration list from which prospective jurors are drawn. The defense also entered into evidence the voter-registration list used in this case. None of the data used by the board of elections identifies the race of prospective jurors. Appellant simply has not shown that voter-registration qualifications are suspect or that the jury-selection procedure employed by Allen County is administered in a discriminatory manner. See, e.g., *United States v. Ireland* (C.A.8, 1995), 62 F.3d 227, 231.

{¶ 68} Based on the foregoing, we sustain in part appellant's revised first proposition of law.

### III. Guilt–Phase Issues

#### A. Irrelevant/Inflammatory Evidence

{¶ 69} In his second proposition of law, appellant contends that the state improperly introduced irrelevant and inflammatory evidence at trial. Appellant takes issue with three physical exhibits admitted into evidence: a tooth fragment and the pants and shirt worn by Jayla Grant. The defense objected to the admission of the tooth and the clothing at the close of the state's case.

{¶ 70} Appellant's challenge to the admission of the tooth fragment on grounds of relevancy and lack of foundation is without merit. Defense counsel did not object to the admission of the tooth on grounds of relevancy and has waived that issue. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 160–161, 749 N.E.2d 226. In any event, the tooth fragment recovered from the crime scene was relevant. Coron Liles testified that he was shot in the mouth and lost two teeth as a result. Obviously, the discovery of a tooth fragment at the crime scene corroborates Coron's testimony and makes it more probable that his testimony was truthful. See Evid.R. 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Moreover, appellant's argument that the tooth fragment was not properly identified as Coron's tooth relates to the weight of the evidence, not its admissibility. See, e.g., *State v. Phillips* (1995), 74 Ohio St.3d 72, 84, 656 N.E.2d 643; *State v. Campbell* (1994), 69 Ohio St.3d 38, 50–51, 630 N.E.2d 339.

{¶ 71} The trial court's admission of Jayla Grant's bloodstained clothes, however, was an error. Jayla was shot twice in the head, but no evidence was introduced to show that she had sustained injuries to any other part of her body. Nor was there any testimony that the blood on the clothing was hers. Her father merely identified these items as the clothing Jayla had been wearing when she was shot. Thus, the clothes were not relevant to any fact of consequence. See Evid.R. 401 and 402. Nevertheless, because the evidence of guilt was overwhelming, we find no basis to conclude that appellant's substantial rights were affected by the admission of this evidence. Evid.R. 103 and Crim.R. 52(A); see, e.g., *State v. Lundgren,* 73 Ohio St.3d at 486, 653 N.E.2d 304. Thus, any error in this regard was harmless beyond a reasonable doubt.

{¶ 72} Appellant also raises issues regarding the testimony of the police officer who identified the tooth fragment at trial and testimony from James Grant about Jayla's plea for help. Appellant failed to object in both instances and thereby waived these issues. See Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. There was no error, plain or otherwise.

{¶ 73} Appellant complains that Officer Hammond was not qualified as an expert in identifying tooth fragments. But Hammond's testimony was admissible as opinion testimony of a lay witness under Evid.R. 701. Evid.R. 701 permits lay-witness opinion testimony if the opinion is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

{¶ 74} Hammond had recovered the tooth fragment from the scene, so his opinion was based on his firsthand perception. His opinion testimony was also

helpful in understanding his testimony about the evidence he had gathered at the scene. See, e.g., *State v. Jells* (1990), 53 Ohio St.3d 22, 29, 559 N.E.2d 464 (permitting lay opinion testimony that is more in the nature of a description by example than the expression of a conclusion). Even if we were to hold otherwise, the lack of scientific authentication of the tooth would not have affected the outcome of appellant's trial.

{¶ 75} In addition, no error occurred regarding James Grant's testimony about his daughter's plea for help. James testified that after the shooting ended, he laid his daughter on the floor to see if she was injured. When James attempted to go for help, Jayla put up her arms and asked James to help her. Appellant describes this testimony as hearsay and contends that it should not have been admitted because it was inflammatory victim-impact evidence.

{¶ 76} First, Jayla's plea for help after she was shot was admissible under the excited-utterance exception of Evid.R. 803(2). See, e.g., *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 94. Second, the statement was relevant to the circumstances surrounding the shooting and the victim's death. Therefore, we reject appellant's second proposition of law.

{¶ 77} In his third proposition of law, appellant contends that the state introduced impermissible victim-impact evidence when the prosecutor elicited irrelevant and inflammatory testimony from the surviving victims. However, defense counsel failed to object to the admission of this allegedly irrelevant and inflammatory testimony and waived all but plain error. *State v. Tibbetts*, 92 Ohio St.3d at 160–161, 749 N.E.2d 226.

{¶ 78} Appellant complains about guilt-phase testimony from the surviving victims describing where they had been shot, the extent of their injuries, and, in some cases, the lingering effects of their injuries. However, we have previously held that evidence that depicts the facts and circumstances surrounding the commission of an offense and the impact of the offense on the victims is admissible during the guilt phase. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878; *State v. Loza* (1994), 71 Ohio St.3d 61, 82–83, 641 N.E.2d 1082.

{¶ 79} Appellant was charged with six counts of attempted aggravated murder, and testimony of the surviving victims regarding the nature and extent of their injuries was relevant to prove the elements of these offenses, including intent. Other testimony describing where the bullets entered the victims' bodies and the resulting wounds is probative of intent to cause death. See, e.g., *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768. This testimony was also probative of the firearm specifications, the aggravated-robbery charge and specification, and the course-of-conduct specification. See, e.g., *State v. Allard* (1996), 75 Ohio St.3d 482, 499–500, 663 N.E.2d 1277 (victim-impact evidence is

permissible if it relates to the facts attendant to the offenses). Accordingly, we overrule appellant's third proposition.

## B. Photographic Evidence

{¶ 80} In his fourth proposition of law, appellant argues that the trial court erred in admitting into evidence cumulative and gruesome photographs of the victims. However, appellant fails to identify by exhibit number or otherwise which photographs are objectionable. Instead he refers only generally to autopsy photographs and photos of dead bodies but offers little more than a conclusory argument for why these photographs were inadmissible.

{¶ 81} In capital cases, nonrepetitive photographs, even if gruesome, are admissible if relevant, as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 82} During the guilt phase, defense counsel stipulated to the admission of all photographic exhibits except one: a photograph of Leneshia Williams taken prior to her death. Thus, appellant has waived all but plain error as to state's exhibits 30 through 63. See *State v. Twyford* (2002), 94 Ohio St.3d 340, 358, 763 N.E.2d 122. We find that no plain error occurred.

{¶ 83} A total of eight autopsy photographs were admitted at trial. Exhibits 30 through 33 are autopsy photos of Jayla Grant. These photos illustrated the coroner's testimony on cause of death and were probative of issues of intent and lack of accident or mistake. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 342, 703 N.E.2d 1251. Although gruesome, these photos were not duplicative or cumulative, and the value of each photograph outweighed any prejudicial impact. See, e.g., *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 88.

{¶ 84} State's exhibits 34 through 37 are autopsy photographs of Leneshia Williams, each depicting the gunshot wound to her head. State's exhibits 34 and 35 are photos of the same wound, but state's exhibit 35 was taken from a wider angle. State's exhibits 34 and 35 are repetitive, and only one of these photos should have been admitted. Similarly, state's exhibit 36 is a close-up version of state's exhibit 37, and only one of these photos should have been admitted. Nevertheless, these photos illustrated the testimony of the coroner and were relevant to show the shooter's intent and the cause of death. See, e.g., *State v. Campbell*, 69 Ohio St.3d at 50, 630 N.E.2d 339; *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 96–97. Accordingly, no plain error occurred from their admission.

{¶ 85} Three crime-scene photographs depicting the body of Leneshia Williams were also properly admitted at trial. State's exhibit 42 is a crime-scene photo of Leneshia lying in a pool of blood. This photo depicts how the body was positioned in the apartment, and, although gruesome, it is probative of the shooter's intent and the manner and circumstances of Leneshia's death. State's exhibit 43 shows Leneshia's hand in a pool of blood. This photo helped explain the testimony of police officers who discovered and processed the crime scene. It is not duplicative or cumulative. The impact of state's exhibit 53, which depicts the body of Leneshia Williams, is minimal. The body is covered by a jacket and partially obscured by a table, and only her hand is visible in the photo.

{¶ 86} As to the remaining photographs admitted at trial, none are gruesome. Those depicting the victims are relevant to show the injuries the surviving victims sustained and are probative of appellant's intent and lack of accident or mistake. See *State v. Maurer*, 15 Ohio St.3d at 265, 15 OBR 379, 473 N.E.2d 768. Several photographs show bloodstained areas and splatters, but no bodies are depicted, and the photos are not gruesome. *State v. DePew* (1988), 38 Ohio St.3d 275, 281, 528 N.E.2d 542; *State v. Smith*, 80 Ohio St.3d at 108, 684 N.E.2d 668. The photo exhibits illustrated the testimony of police officers and victims who described the crime scene and evidence discovered there and were relevant to the nature and circumstances of the crime. See, e.g., *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 72; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 676–677, 687 N.E.2d 1358.

{¶ 87} Appellant also complains that the trial court erred in admitting gruesome photos during the penalty phase. Again, appellant fails to specify which photos were prejudicial. Defense counsel did object to the admission of state's exhibits 30 through 41 in the penalty phase. However, a trial court may properly allow repetition of much or all that occurred in the guilt phase, pursuant to R.C. 2929.03(D)(1). *State v. DePew*, 38 Ohio St.3d at 282–283, 528 N.E.2d 542. As we previously indicated, state's exhibits 34 and 35 were repetitive of each other, as were state's exhibits 36 and 37. But the error in admitting them was harmless. Thus, we deny appellant's fourth proposition of law.

## C. Guilt–Phase Jury Instructions

{¶ 88} In his fifth proposition of law, appellant takes issue with the instructions the trial court provided to the jury. Aside from the reasonable-doubt instruction, appellant did not object at trial to the instructions that he now challenges. We find no error, plain or otherwise.

{¶ 89} The trial court's purpose instruction accurately reflects the law. See, e.g., *State v. Stallings* (2000), 89 Ohio St.3d 280, 291, 731 N.E.2d 159, and *State v. Loza*, 71 Ohio St.3d at 81, 641 N.E.2d 1082 (two cases with purpose instructions similar to that used in this case). In addition, contrary to appellant's challenge,

the reasonable-doubt instruction in the guilt phase was in accord with R.C. 2901.05(D). We have previously rejected similar complaints against the statutory definition. See, e.g., *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Getsy* (1998), 84 Ohio St.3d 180, 202, 702 N.E.2d 866.

{¶ 90} Appellant also contends that the trial court's instructions defining causation and foreseeability were incompatible with the requirement that the state prove a specific intent to cause death. Nevertheless, the use of these instructions is not plain error when the instructions as a whole make clear that the jury is required to find purpose to kill in order to convict. *State v. Phillips,* 74 Ohio St.3d at 100, 656 N.E.2d 643. Here, the trial court instructed the jury that purpose to cause the death of another is an essential element of the offenses of aggravated murder and attempted aggravated murder and further instructed that "if there was no purpose to cause the death of anyone, the defendant cannot be found guilty of Aggravated Murder or Attempted Aggravated Murder." Thus, plain error is absent. Therefore, appellant's fifth proposition of law is rejected.

## IV. Penalty–Phase Issues

### A. Readmission of Guilt–Phase Evidence

{¶ 91} Appellant argues in his sixth proposition of law that the trial court erred when it readmitted guilt-phase testimony from the surviving victims in the penalty phase. Appellant contends that the vast majority of guilt-phase testimony constituted improper victim-impact evidence.

{¶ 92} At the beginning of the penalty phase, the trial court merged the two capital specifications that appellant had been found guilty of committing, leaving only the R.C. 2929.04(A)(5) course-of-conduct aggravating circumstance for the jury's consideration. Over defense counsel's objection, the trial court told the jurors that they could consider any of the guilt-phase testimony that related to the course-of-conduct aggravating circumstance.

{¶ 93} R.C. 2929.03(D)(1) requires the jury to consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." See, also, *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352–353, 662 N.E.2d 311. Contrary to appellant's argument, testimony from the surviving victims regarding the nature and extent of their injuries was directly relevant to the course-of-conduct aggravating circumstance and to the nature and circumstances of the aggravating circumstance.

{¶ 94} Appellant also complains that the trial court erred in readmitting certain photos during the penalty phase, but we rejected this same argument regarding appellant's fourth proposition of law. For the foregoing reasons, we overrule appellant's sixth proposition.

### B. Presence of Surviving Victims during Penalty Phase

{¶ 95} Appellant argues in his seventh proposition of law that his right to a fair sentencing proceeding was violated when the trial court permitted the surviving victims to be present in the courtroom throughout the penalty phase. R.C. 2930.09 provides that a victim in a case may be present whenever the defendant is present during any stage of the case that is conducted on the record, other than a grand-jury proceeding, unless the court determines that exclusion of the victim is necessary to protect the defendant's right to a fair trial.

{¶ 96} Appellant contends that the trial court failed to make a determination that the presence of these victims would not violate his right to a fair sentencing determination. Although R.C. 2930.09 provides that a defendant's fair-trial rights are superior to a victim's right to be present, the statute clearly gives the trial court discretion to make the determination whether the victim's presence will prejudice the defendant. See *State v. Martin*, 151 Ohio App.3d 605, 2003-Ohio-735, 784 N.E.2d 1237, at ¶ 66. Here, nothing in the record supports appellant's claim that the trial court failed to consider whether his rights would be jeopardized by the presence of the surviving victims. In fact, the trial court excluded these witnesses from the courtroom during the guilt phase in order to protect appellant's fair-trial rights.

{¶ 97} Moreover, appellant offers no evidence or argument beyond pure speculation that the presence of the surviving victims at the penalty-phase proceedings was prejudicial. None of the surviving victims testified during the penalty phase, and it is not clear which victims, if any, were present in the courtroom. Thus, appellant has not demonstrated that his right to a fair trial was compromised in any way. Therefore, we deny appellant's seventh proposition.

### C. Penalty–Phase Jury Instructions

{¶ 98} In his eighth proposition of law, appellant raises several claims against the trial court's penalty-phase instructions to the jury. We find that none of appellant's arguments has merit.

{¶ 99} First, appellant challenges the trial court's instructions regarding the guilt-phase testimony that was relevant to the penalty-phase weighing process. Appellant's argument here is really a challenge to the admission of guilt-phase testimony in the penalty phase. However, we considered and rejected that same argument under appellant's sixth proposition of law. To the extent that appel-

lant's argument can be construed as a challenge to the court's jury instructions on relevant guilt-phase testimony, no error occurred. Viewing the penalty instructions as a whole, we hold that the trial court adequately guided the jury as to the evidence to consider in the penalty phase. Moreover, much of the guilt-phase testimony was relevant in the penalty phase because it related to the course-of-conduct aggravating circumstance, the nature and circumstances of the offense, and the asserted mitigating factors. See, e.g., *State v. Jones* (2001), 91 Ohio St.3d 335, 349–350, 744 N.E.2d 1163.

{¶ 100} Appellant next argues that the trial court's penalty-phase instructions "relieved the state of its mandated burden of proof." However, the trial court properly instructed the jury that the state had the burden of proving beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. Additionally, appellant's challenge to R.C. 2929.03(D)(1), which puts the burden of going forward with mitigating evidence on the defendant, lacks merit because appellant presented evidence in mitigation. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 16, 564 N.E.2d 408.

{¶ 101} Appellant also challenges the trial court's reasonable-doubt instruction in the penalty phase. But the reasonable-doubt instruction given followed the suggested instruction in *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. In addition, the trial court need not instruct on residual doubt. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112; *State v. Green* (2000), 90 Ohio St.3d 352, 360, 738 N.E.2d 1208.

{¶ 102} Finally, appellant argues that the trial court erred in failing to instruct the jury on the true meaning of parole eligibility. The trial court instructed the jury that if the state failed to prove beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors, then it would be the jurors' "duty to decide which of the following life sentence alternatives should be imposed—(A), the sentence of life imprisonment with no parole eligibility until twenty-five full years of imprisonment have been served; or, (B) the sentence of life imprisonment with no parole eligibility until thirty full years of imprisonment have been served; or, (C) life imprisonment without the possibility of parole."

{¶ 103} The trial court's instruction clearly indicated that if the jury chose life without parole, appellant would never be eligible for parole. In addition, the instruction made clear that if the jury recommended one of the other life sentences, appellant would serve a full 25 or 30 years before being eligible for parole. See *State v. Mills* (1992), 62 Ohio St.3d 357, 375, 582 N.E.2d 972. Moreover, while the trial court declined to include in its instructions appellant's proposed explanation of parole eligibility, defense counsel were given leeway to explain during closing argument that a person is not automatically paroled once

he or she is eligible for parole. Accordingly, appellant's eighth proposition is overruled.

## V. Sentencing Opinion

{¶ 104} Appellant contends in his 11th proposition of law that the trial court's sentencing opinion does not comply with the requirements of R.C. 2929.03(F). R.C. 2929.03(F) requires the trial court, in imposing a sentence of death, to state in a separate opinion "its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances * * * were sufficient to outweigh the mitigating factors."

{¶ 105} Appellant first argues that the trial court virtually ignored substantial mitigating factors and erred in assigning little or no weight to mitigating factors.

{¶ 106} We have long held that in imposing sentence, the assessment of and weight given to mitigating evidence are within the trial court's discretion. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. "The fact that mitigation evidence is admissible 'does not automatically mean that it must be given any weight.' *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus." *State v. Mitts* (1998), 81 Ohio St.3d 223, 235, 690 N.E.2d 522. "[T]he weight, if any, to assign a given factor is a matter for the discretion of the individual decisionmaker." *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124.

{¶ 107} Appellant further contends that the trial court failed to explain why the sole aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. But the trial court's opinion contradicts appellant's claim. The trial court discussed in detail the mitigating evidence that had been presented, including appellant's history, character, and background. It also discussed its determination that the nature and circumstances of the offenses provided little mitigating weight. The court also set forth the statutory mitigating factors established by the evidence, R.C. 2929.04(B)(4), (5), (6), and (7). The trial court then indicated what weight, if any, it assigned to the mitigating factors. Thereafter, the trial court concluded that appellant's acting in a course of conduct that involved the purposeful killing of or attempt to kill eight people, and the actual killing of two people, "places him in a narrow class of murderers that deserve society's ultimate punishment." Accordingly, we reject appellant's 11th proposition of law.

## VI. Prosecutorial Misconduct

{¶ 108} In his ninth proposition of law, appellant contends that he was denied a fair trial because of prosecutorial misconduct. Whether a prosecutor's remarks

at trial require a reversal of conviction requires an analysis as to (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 109} *Guilt-phase closing argument.* First, appellant argues that prosecutorial misconduct occurred during the guilt-phase closing argument, when the prosecutor focused on the pain and suffering of the victims and presented graphic photographs that appealed to the jurors' passions and prejudices.

{¶ 110} "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915, overruled on other grounds, *State v. McGuire,* 80 Ohio St.3d at 402–404, 686 N.E.2d 1112. Most of the comments complained of here reflected evidence that had been presented at trial and were not improper. The prosecutor merely stressed the strength of the evidence that appellant had committed the charged offenses. See, e.g., *State v. Hicks* (1989), 43 Ohio St.3d 72, 76, 538 N.E.2d 1030.

{¶ 111} Appellant urges that the prosecutor exceeded the scope of proper argument when he displayed and commented on photographs depicting the deceased victims. The prosecutor first identified a photo of Leneshia Williams and stated: "Leneshia was just seventeen years old. She can't tell us what happened. The reason she can't tell us is because he and his brother shot her and she died." The prosecutor then displayed an autopsy photo of Jayla Grant, and commented: "Then there's Jayla, who even in death is a beautiful little girl. The last thing she did is reach up to her dad and say, 'Help me, daddy. Help me.' * * * He (appellant) and his brother * * * turned this, this young girl, and he turned her into that. * * * He turned that beautiful little three year old girl into a specimen on the Lucas County Coroner's Table."

{¶ 112} There was no objection to either comment, and, therefore, the prosecutor's remarks cannot be grounds for error unless they served to deny appellant a fair trial. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus, death penalty vacated on other grounds, *Wade v. Ohio* (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157.

{¶ 113} We find that the prosecutor's comments do not rise to the level of plain error. Evidence of appellant's guilt was overwhelming, and the statements in this case were not so inflammatory that appellant's convictions were the product of passion and prejudice rather than proof of guilt. See *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 490 N.E.2d 906. Cf. *State v. Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203. In addition, a prosecutor's argument must be viewed

in its entirety to determine prejudice. *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068. In this case, the prosecutor's remarks did not materially prejudice appellant. Finally, the trial court instructed the jurors that they must not be influenced by any consideration of sympathy or prejudice.

{¶ 114} The prosecutor also gave his personal opinion when, apparently referring to a photograph depicting an injured Armetta Robinson, he stated, "Maybe Armetta is the luckiest of all. *She doesn't look so lucky there.* But, today, she really has no independent memory of what happened that terrible day in that kitchen." (Emphasis added.) Defense counsel failed to object, and we find that this statement did not affect the outcome of appellant's trial. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.

{¶ 115} *Penalty-phase closing argument.* Appellant next contends that the prosecutor misled the jury by equating his mitigation evidence with an attempt to avoid moral culpability. Appellant, however, did not object to the comments he now complains of and has waived all but plain error. *State v. Lundgren,* 73 Ohio St.3d at 492, 653 N.E.2d 304.

{¶ 116} Several times during rebuttal closing argument, the state questioned whether appellant's mitigating evidence "lessen[ed] his moral culpability or diminish[ed] the appropriateness of the death sentence." Although the prosecutor's comments did stray from the definition of "mitigating evidence" approved in *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, the trial court properly defined "mitigating factors," and the jury was not limited in its consideration of mitigating evidence, *State v. Getsy,* 84 Ohio St.3d at 200–201, 702 N.E.2d 866. Moreover, the trial court correctly instructed the jury on the appropriate weighing of mitigating factors, and the jury was advised that the issue before them in the penalty phase was punishment and not an assessment of culpability. Therefore, plain error did not occur.

{¶ 117} *Improper vouching.* Appellant argues that the prosecutor committed misconduct by improperly vouching for the credibility of Tara Cunningham, appellant's half-sister. It is improper for an attorney to express a personal belief or opinion as to the credibility of a witness. *State v. Williams,* 79 Ohio St.3d at 12, 679 N.E.2d 646. In order to vouch for the witness, the prosecutor must imply knowledge of facts outside the record or place the prosecutor's personal credibility in issue. See *State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246.

{¶ 118} Appellant claims that the following comment made during the state's guilt-phase rebuttal closing argument constituted improper vouching:

{¶ 119} "Then, Tara. Tara has become just such a horrible witch who didn't like her brother much. Well, it's amazing. Just hours before [the murder] they're [appellant and Jeronique] over to her house. They're upstairs and they're using her shirt to wipe off the gun and to wipe off the bullets. Now, you

know, they're [defense counsel] vilifying her. She was badgered. They were belligerent. She had a brutal cross-examination. She stood up. You know, it's not easy for someone to come in and testify against their brothers. But, apparently she has—she may lead a different life style than most of us, but she has a sense of decency. She knows a little bit of what's right and what's wrong and what's just. She had no motive to lie. No motive. None whatsoever."

{¶ 120} The prosecutor did not improperly vouch for Tara's credibility as a witness. The prosecutor merely argued that Tara was a reliable witness and that she lacked any motive to lie. This type of argument is not improper vouching when, as here, the prosecutor is responding to defense counsel's attacks on a witness's credibility and refers to facts in evidence that tend to make the witness more credible. See *State v. Green*, 90 Ohio St.3d at 373–374, 738 N.E.2d 1208. Moreover, defense counsel did not object, and there was no plain error. When viewed in its entirety, the prosecutor's rebuttal argument neither materially prejudiced appellant nor denied him a fair trial. See *State v. Loza*, 71 Ohio St.3d at 78, 641 N.E.2d 1082.

{¶ 121} *Opposing theories.* Appellant contends that the prosecutor committed misconduct by relying on opposing theories during the trials of appellant and Jeronique. Appellant argues that the state presented evidence and argument at his trial that he was the person primarily responsible for committing these crimes but that during Jeronique's trial, the prosecutor had argued that Jeronique was the primary planner and actor. For the following reasons, appellant's claim is without merit.

{¶ 122} First, appellant offers only a conclusory argument that the state relied on inconsistent theories in appellant's and Jeronique's trials. The record indicates that appellant's counsel received complete transcripts of the testimony that Tara Cunningham and the surviving victims gave in Jeronique's trial. Yet appellant fails to identify any portions of the record that would support his claim that the prosecutor pursued conflicting theories.

{¶ 123} Second, a comparison of the record in this case with this court's decision in Jeronique's direct appeal shows that the prosecutor's theory was the same in both cases. See *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504. Both appellant and Jeronique were indicted on identical charges of aggravated murder and attempted aggravated murder. Neither was charged as a principal offender in the aggravated murders, and the prosecutor argued in both cases that appellant and Jeronique had acted in concert. Moreover, appellant has not shown that the prosecutor acted in bad faith and deliberately presented false or conflicting evidence in his and Jeronique's trials. In fact, the state's evidence in both trials was substantially identical. Thus, appellant has not presented any argument or evidence that the state advanced

factually inconsistent theories to secure convictions against appellant and Jeronique. Cf. *Stumpf v. Mitchell* (C.A.6, 2004), 367 F.3d 594, judgment reversed in part and vacated in part (2005), —— U.S. ——, 125 S.Ct. 2398, 162 L.Ed.2d 143.

{¶ 124} *Failure to provide exculpatory evidence.* Finally, appellant contends that the state failed to disclose material exculpatory evidence to defense counsel prior to trial. During defense counsel's cross-examination of Coron Liles, it was discovered that the state had failed to disclose to the defense that detectives had shown Coron a photo array containing a photo of appellant. During a sidebar, the trial court ordered the state to produce the photo array and a list of witnesses who were shown the array.

{¶ 125} The next day, the trial court held a hearing on this issue outside the presence of the jury. During the hearing, the prosecution acknowledged that it had located two photo arrays, one with appellant's photo and another that included a photo of Jeronique. Both arrays were provided to defense counsel. Detective Leland then testified that he had shown the arrays to Coron and James Grant. Coron had been able to identify both appellant and Jeronique as the shooters. James Grant had identified Jeronique but had not been able to identify appellant from the array.

{¶ 126} The prosecutor then proffered a professional statement for the record that his failure to disclose the photo arrays to the defense was due to inadvertence and not bad faith. The prosecutor explained that he did not believe that the identification of the assailants was an issue, because one of the victims knew the assailants by name and both appellant and Jeronique had given statements to police about their involvement. Because it never occurred to the prosecutor that identification would become an issue in this case, the photo arrays had been overlooked.

{¶ 127} Defense counsel moved for sanctions and a mistrial. The trial court denied both motions. The trial court found that the prosecutor had violated Crim.R. 16(E)(3) by failing to timely disclose the photo arrays but that the violation was not willful or prejudicial. The trial court also determined that the photo arrays and the procedure that Detective Leland had used to show them to the victims were not impermissibly suggestive.

{¶ 128} Appellant complains on appeal that James Grant's failure to identify appellant in the array was exculpatory and that he was prejudiced by the state's failure to disclose this evidence prior to trial. He also contends that defense counsel were unable to have an expert review the array for suggestibility. For the following reasons, appellant's arguments are not well taken.

{¶ 129} First, James Grant's failure to identify appellant in the photo array is not material evidence. Under *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215, the prosecutor is obligated to disclose all material

evidence favorable to the defense on the issue of guilt or punishment. But "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.

{¶ 130} At trial, five witnesses, including James Grant, identified appellant as one of the shooters in this case. In addition, Shane Liles, Coron Liles, and Tomeaka Grant knew appellant prior to the shootings. Moreover, appellant admitted during trial that he had been at the scene and that he had shot Shane Liles in the back. Therefore, while Grant's failure to identify appellant from the photo array may arguably be favorable evidence, in light of the substantial testimony identifying appellant, it is not material evidence, as explained in *Brady v. Maryland.* The state's failure to disclose this evidence does not undermine confidence in the outcome of the trial. See, e.g., *State v. Waddy* (1992), 63 Ohio St.3d 424, 432–434, 588 N.E.2d 819.

{¶ 131} Furthermore, prosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice. *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 453 N.E.2d 689. Here, the trial court found that the prosecutor's failure to disclose was not a willful violation of the rule, and we can find no reason to overturn that determination on appeal.

{¶ 132} Moreover, defense counsel were provided with the photo array prior to James Grant's being called as a witness. Defense counsel had the opportunity but never attempted to impeach Grant's in-court identification of appellant based on Grant's inability to identify appellant in the photo array. Defense counsel also declined an opportunity to cross-examine Coron Liles on this issue. Thus, appellant cannot now claim that he was prejudiced regarding the photo array. See *State v. Joseph* (1995), 73 Ohio St.3d 450, 458, 653 N.E.2d 285. Based on the foregoing, we overrule appellant's ninth proposition of law.

## VII. Ineffective Assistance of Counsel

{¶ 133} In his tenth proposition of law, appellant makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that his counsel's performance was deficient and, second, that his counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show deficient performance,

defendant must prove that his counsel's performance fell below an objective level of reasonable representation. To show prejudice, defendant must show a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington; State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373.

{¶ 134} *Expert and Investigative Assistance.* Appellant first contends that his trial counsel were ineffective for failing to request or demonstrate the need for expert or investigative assistance in order to present an effective penalty-phase defense. But appellant's trial counsel did request funds for a defense psychologist and a defense investigator. The trial court granted both requests, and defense counsel employed a psychologist and an investigator to prepare appellant's mitigation defense. Thus, appellant's claim is not supported by the record.

{¶ 135} *Motions to Suppress Statements.* Appellant claims that his trial counsel failed to investigate the circumstances surrounding his statements to police and to effectively prepare and litigate the motion to suppress those statements. However, even if this were true, appellant cannot show that he suffered prejudice. The state did not introduce any evidence at trial of appellant's statements to police.

{¶ 136} *Pretrial–Motion Practice.* Appellant claims that his trial counsel did not adequately support legal arguments contained in their pretrial motions. But appellant fails to show how his counsel's performance was deficient or prejudicial in regard to any particular motion. Therefore, we find that no basis exists to find deficient performance or prejudice. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, following *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 137} *Inadequate voir dire.* Appellant contends that his counsel's voir dire performance was deficient. Appellant argues that his counsel did not zealously demand the right to fully examine jurors. Appellant also claims that his trial counsel failed to consistently and effectively question prospective jurors on their racial attitudes and their ability to put aside such attitudes.

{¶ 138} Trial counsel, who saw and heard the jurors, were in the best position to determine the extent to which prospective jurors should be questioned. *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, at ¶ 108. As we discussed regarding appellant's revised first proposition of law, his trial counsel thoroughly examined prospective jurors regarding their exposure to pretrial publicity, their views concerning capital punishment, their ability to consider potentially mitigating evidence, and their opinions on race and religion, as well as other topics.

{¶ 139} Moreover, defense counsel did vigorously contest the trial court's rulings restricting voir dire. Defense counsel placed several objections on the record and also moved for a mistrial on the basis that the trial court was unduly restricting the voir dire. Defense counsel also raised an objection claiming that death-penalty-opposed jurors were being systematically excluded. Thus, we conclude that appellant's counsel's performance during voir dire reflected reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 140} *Failure to inquire into witness consideration.* Appellant claims that his trial counsel were deficient for failing to cross-examine Tara Cunningham on whether she had received consideration from the state in exchange for her testimony. However, appellant's argument is based on pure speculation and is rejected.

{¶ 141} There is no evidence in the record that the state offered anything to Tara for her testimony. Had the state made a deal with Tara in exchange for her testimony, this information would have been discoverable under Crim.R. 16(B)(1)(f). See, e.g., *State v. Joseph*, 73 Ohio St.3d at 458, 653 N.E.2d 285. Under Evid.R. 607(B), "[a] questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." See, also, *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph two of the syllabus, overruled on other grounds by *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112. Because there is no reasonable basis for believing that a deal existed, defense counsel cannot be deemed ineffective for failing to question Tara about whether she received a deal for her testimony.

{¶ 142} *Counsel's failure to interview expert witness.* Appellant next claims that defense counsel provided ineffective assistance by failing to interview the coroner before cross-examining her, which resulted in an unsuccessful attempt to elicit favorable testimony on the trajectory of the bullets that killed Jayla Grant and injured others. Alternatively, appellant contends that defense counsel should have sought the assistance of an independent ballistics expert.

{¶ 143} However, appellant overstates the importance of the ballistics evidence. Appellant was charged and tried as an accomplice in the aggravated murders and not as a principal offender. Thus, whether the bullets that killed Jayla Grant and Leneshia Williams came from his gun or Jeronique's was not critical to establishing appellant's guilt of the aggravated murders.

{¶ 144} Moreover, we find that substantial evidence, both testimonial and physical, linked appellant to these murders. Several victims testified that appellant had been shooting a black, automatic handgun, and all of the ballistics evidence recovered from the scene, except one bullet fragment, was identified as ammunition typically fired from an automatic handgun. In contrast, the victims

recalled that Jeronique had been shooting a revolver. Therefore, appellant cannot prove that he suffered any prejudice from his counsel's failure to interview the coroner. Similarly, appellant has not shown that his counsel's failure to employ a ballistics expert deprived him of a fair trial.[1]

{¶ 145} ***Failure to object to prosecutorial misconduct.*** Appellant also claims deficient performance in his trial counsel's failure to object to various instances of alleged prosecutorial misconduct. But as mentioned in our discussion of appellant's ninth proposition of law, none of the alleged instances of prosecutorial misconduct prejudicially affected appellant's substantial rights. Thus, appellant's trial counsel were not ineffective for failing to object to the prosecutor's alleged misconduct.

{¶ 146} ***Failure to present mitigating evidence.*** Appellant's final claim is that his counsel were ineffective during the penalty phase of his trial because they failed to fully investigate appellant's background and present "compelling mitigating evidence arising from [appellant's] psychosocial history and elsewhere." However, the record does not support appellant's claim. See *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 59–62. See, also, *Wiggins v. Smith* (2003), 539 U.S. 510, 534–538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (a case in which the Supreme Court vacated the defendant's death sentence because defense counsel had failed to pursue and present migrating evidence that it was clear from the record should have been pursued and presented). Therefore, appellant's tenth proposition of law is overruled.

## VIII. Constitutionality

{¶ 147} We reject appellant's various constitutional challenges to Ohio's death-penalty statutes in his 12th proposition of law. Ohio's capital-sentencing scheme is constitutional. See, e.g., *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Evans*, 63 Ohio St.3d at 253–254, 586 N.E.2d 1042. In addition, we reject appellant's international-law claims. See *State v. Ashworth* (1999), 85 Ohio St.3d 56, 70, 706 N.E.2d 1231, and *State v. Phillips*, 74 Ohio St.3d at 103–104, 656 N.E.2d 643.

## IX. Independent Sentence Evaluation

### A. Penalty Phase

{¶ 148} During the penalty phase, appellant called four mitigation witnesses.

{¶ 149} Joyce McNeal, appellant's aunt, testified that appellant was three or four years old when his mother killed his father with a knife. She also testified

---

1. The trial court did grant defense counsel's motion for funds to hire a ballistics expert, but apparently defense counsel decided that such an expert would not aid appellant's defense.

that appellant's mother, Betty Cunningham, had been a heavy drinker, had physically abused her children, and had attempted suicide. She said that at times, there had been no food in the house and no furniture because Betty had sold it to buy drugs.

{¶ 150} Throughout childhood, appellant was intermittently placed in his grandmother's care and in foster homes. Despite Betty's problems, the children's services agency often returned appellant to her care. Appellant loved his grandmother, and after she died in 1999, no one was there to care for appellant.

{¶ 151} During appellant's early childhood, he suffered from asthma attacks. According to McNeal, appellant's half-brother Jeronique Cunningham had a negative influence over him, and she blamed Jeronique for appellant's current situation.

{¶ 152} Denise Cage, another aunt, also testified that Betty had not been a good mother and that her children had suffered as a result. She said that Betty had mental health problems and had made several suicide attempts. Both Betty and appellant's father had abused drugs and alcohol, and their relationship was violent. Cage said that appellant had often witnessed his parents arguing and fighting and that during one altercation, Betty killed appellant's father with a knife. After that, appellant lived with his grandmother and was in and out of foster homes. Cage said that appellant had reported that he had been raped while in foster care, but she did not know the details of the crime.

{¶ 153} Cage testified that appellant's grandmother had been the only person who loved appellant unconditionally. Because of Betty's problems with drugs, appellant's grandmother tried to provide him with a stable home and proper guidance. Betty did have periods of sobriety during which she was a good mother, and during these times, the children's services agency would return appellant and the other children to Betty's care. However, Betty's sobriety was usually short-lived, and only when appellant lived with his grandmother did his life have security and structure.

{¶ 154} Betty Cunningham testified that appellant was the fourth of her five children. She said that appellant's father, Cleveland Jackson Sr., had often turned violent when he drank, and during one fight, Betty killed him in self-defense. Betty claimed that all of her children saw this happen.

{¶ 155} Betty testified that after appellant's father's death, appellant had no positive male role model in his life. She said that she had continued to drink heavily and started using cocaine. She also attempted suicide. Because of her substance abuse, Betty frequently lost custody of her children. Betty's mother would care for the children on some of these occasions, and at other times, a children's services agency took custody of them.

{¶ 156} Betty testified that her mother had been more of a mother to appellant than Betty had been. She said that after his grandmother became seriously ill, appellant was very depressed and seemed lost. After his grandmother's funeral, Betty had to plead with appellant to get him to leave the funeral home.

{¶ 157} Dr. Kathleen Burch, a psychologist, interviewed appellant, administered psychological tests, conducted a mental-status examination, and consulted with another psychologist. Burch also examined various records relating to appellant, including children's services records, and interviewed his aunt Denise Cage.

{¶ 158} Burch concluded that appellant had suffered through a dysfunctional, chaotic childhood. She said that appellant's witnessing his mother kill his father had instilled in appellant at a very early age a belief that "the world is a very unsafe, dangerous, and violent place."

{¶ 159} Burch determined that appellant's mother had been a chronic abuser of drugs and alcohol and had not adequately cared for her children. Betty also had a history of mental instability and suicide attempts. Betty had sometimes left her children unsupervised for long periods of time. Children's services' records from the 1980s described appellant's home environment as filthy, with garbage and dirty clothes on the floor. Appellant and his siblings had played on floors littered with broken glass. At times, there were no beds for the children to sleep in, no furniture, and no refrigerator. Betty had sold furniture to get money to purchase drugs. Sometimes, appellant and his siblings would get only one meal a day, which consisted of bread and honey for breakfast. The children's services records also indicated that there had been some physical abuse of the children. And appellant told Burch that his mother would smoke crack cocaine and blow the smoke in his face.

{¶ 160} Burch testified that her review of the children's services records also showed that on several occasions, the children were removed from the home and placed with their maternal grandmother or in foster care. In addition, appellant spent time in a number of juvenile institutions. Appellant did spend a lot of time with his grandmother, and she was a positive influence. But when his grandmother developed Alzheimer's disease in 1990, appellant "began to run the streets."

{¶ 161} Burch identified several contributing factors to appellant's criminal behavior. First, Burch indicated that appellant had not been provided with the love, affection, and basic necessities that most parents provide to their children and that a lack of nurturing in young children is often related to later criminal activity. Second, she noted that appellant had lacked a positive male role model and that this is also associated with increased risks of criminal activity. Third, Burch noted that appellant's parents had been chronic substance abusers and had

been involved in criminal activity. As a result, they had failed to provide appellant with models of normal, prosocial, and lawful behavior. Fourth, she noted that appellant had grown up in a poor neighborhood, where there are higher rates of crime and deviant, antisocial behavior.

{¶ 162} Dr. Burch testified that she believes that the way appellant "thinks about himself and the way he looks at the world makes him feel like he's pretty messed up and * * * can't trust anybody, and the world is dangerous." Burch also found that appellant is "more inclined than most people to deal with feelings on an intellectual level." He does not effectively deal with his emotions. She also determined that appellant is extremely self-centered and narcissistic, possessing a sense of entitlement that "the world owes him a living; and [he has] a tendency to blame other people for his problems." He also has "negative and unfavorable attitudes towards his body," and questions his own worth and adequacy.

{¶ 163} Dr. Burch concluded that appellant does not have a formal thought disorder, such as schizophrenia. He can think logically. But he is paranoid and likely to misinterpret other people's views of him. Burch diagnosed appellant with an antisocial-personality disorder. This disorder formed very early in appellant, perhaps when he witnessed his father's death, and he never received therapy to deal with this tragedy. She explained that because of appellant's upbringing, he developed a pessimistic view of the world that severely limits his ability to trust others. Burch, however, noted that not everyone who is labeled with a personality disorder ends up in jail and that his disorder did not excuse his conduct.

{¶ 164} On cross-examination, Burch testified that appellant has a tendency to disregard the rights and welfare of others and to blame others for his behavior. She also admitted that appellant had been provided with many treatments over the past ten years, without any apparent improvement.

## B. Sentence Evaluation

{¶ 165} The jury convicted appellant of two death-penalty specifications: R.C. 2929.04(A)(5), aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons, and R.C. 2929.04(A)(7), aggravated murder with prior calculation and design, during an aggravated robbery. For the penalty phase, the trial court merged the two aggravating circumstances and submitted only the course-of-conduct specification for the jury's consideration.

{¶ 166} Upon independent assessment, we hold that the evidence establishes beyond a reasonable doubt the R.C. 2929.04(A)(5) aggravating circumstance charged against appellant. As to Count Two, the murder of Leneshia Williams,

the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

{¶ 167} Nothing in the nature and circumstances of the offenses is mitigating. Appellant and Jeronique formulated a plan to rob Shane Liles. During the course of the robbery, appellant forced Shane into an upstairs bedroom at gunpoint, where he robbed him of money and drugs. Appellant then tied Shane's hands behind his back and forced him into the kitchen, where Jeronique was holding Dwight Goodloe, Coron Liles, Armetta Robinson, Leneshia Williams, and Tomeaka, James, and Jayla Grant at gunpoint. Appellant shot Shane in the back, and appellant and Jeronique then opened fire on the rest of the group, killing Jayla and Leneshia.

{¶ 168} Appellant's history and background provide some mitigating features. Appellant had a dysfunctional, chaotic upbringing. Aside from his maternal grandmother's care, appellant was given little moral guidance, support, or affection. At a young age, appellant watched his mother kill his father. Appellant had no positive male role model, and his parents abused drugs and alcohol and engaged in criminal activity. His mother has a lengthy history of mental-health problems in addition to her substance-abuse problems. Most of the time, Betty was unable to properly care for appellant, and he was often neglected. There is also evidence in the children's services records that appellant was abused physically. On several occasions, children's services removed appellant and his siblings from Betty's custody. Appellant was at times cared for by his grandmother, who provided a secure and stable environment for appellant. However, appellant's time with her was not enough to have any lasting, positive effect.

{¶ 169} Upon review of the mitigating evidence, we find that appellant clearly had a troubled and neglected childhood. However, we have upheld the death sentences of other defendants who had backgrounds similar to and worse than appellant's. See, e.g., *State v. Campbell* (2002), 95 Ohio St.3d 48, 50–54, 765 N.E.2d 334; *State v. Biros* (1997), 78 Ohio St.3d 426, 455–457, 678 N.E.2d 891. In this case, we determine that appellant's history and background are entitled to only some weight in mitigation, just as we have determined in other capital cases in which the defendants had similar backgrounds. See, e.g., *State v. Grant* (1993), 67 Ohio St.3d 465, 486, 620 N.E.2d 50; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 186–195.

{¶ 170} We find, however, that appellant's character is entitled to no weight in mitigation. There was no evidence presented that appellant possessed any specific redeeming qualities.

{¶ 171} No evidence was presented in regard to R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), or (B)(3) (mental disease or defect).

{¶ 172} The trial court did assign weight under R.C. 2929.04(B)(5) to appellant's apparent lack of a significant criminal history. However, our review of the record indicates that appellant never presented any evidence to prove the existence of this factor. See R.C. 2929.03(D)(1) (defendant shall have the burden of going forward with evidence of mitigating factors). Instead, it appears that the trial court found the existence of this factor based on a lack of evidence from the state that appellant had ever been convicted of a crime as an adult. Moreover, appellant was adjudicated a delinquent child under R.C. Chapter 2151. Because appellant has not carried his burden under R.C. 2929.03, we conclude that the R.C. 2929.04(B)(5) mitigating factor is inapplicable.

{¶ 173} In contrast, appellant's age of 23 years at the time of the offenses qualifies as a mitigating factor under R.C. 2929.04(B)(4) (youth of offender). However, we accord this factor only modest weight. See, e.g., *State v. Fears* (1999), 86 Ohio St.3d 329, 349, 715 N.E.2d 136; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988. In addition, R.C. 2929.04(B)(6) (accomplice only) directly applies as a mitigating factor because appellant was indicted, tried, and convicted as an accomplice, not as a principal offender.

{¶ 174} Nevertheless, after reviewing the facts of this case, we assign no weight to the R.C. 2929.04(B)(6) mitigating factor. Appellant was a crucial participant in the murders. See *State v. Issa* (2001), 93 Ohio St.3d 49, 71, 752 N.E.2d 904.

{¶ 175} As to the R.C. 2929.04(B)(7) "other factors," appellant's antisocial-personality disorder deserves some weight in mitigation. Appellant's personality disorder was likely the result of his troubled and dysfunctional upbringing. Nevertheless, we accord little weight to this disorder, as it did not inhibit his ability to control his actions. See, e.g., *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 119; *Wilson*, 74 Ohio St.3d at 401, 659 N.E.2d 292.

{¶ 176} In summary, appellant's collective mitigation evidence is modest when compared with the aggravating circumstance. Upon independent weighing, we hold that the course-of-conduct aggravating circumstance in Count Two, the murder of Leneshia Williams, outweighs appellant's combined mitigating factors beyond a reasonable doubt. Accordingly, we find that the sentence of death for Leneshia's murder is appropriate in this case.

{¶ 177} Finally, the sentence imposed here is proportionate to death sentences we approved in other cases of murder as a course of conduct involving the purposeful killing of two or more persons. See, e.g., *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Frazier* (1991), 61 Ohio St.3d 247, 574

N.E.2d 483; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895; *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

{¶ 178} Accordingly, we affirm appellant's convictions and his sentence of death for the murder of Leneshia Williams. We vacate his death sentence for the murder of Jayla Grant and remand the cause to the trial court for resentencing consistent with R.C. 2929.06. All other sentences are affirmed.

Judgment affirmed in part
and reversed in part,
and cause remanded.

PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

RESNICK, J., concurs in part and dissents in part.

_____

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.

{¶ 179} I concur in the majority's decision to affirm appellant's convictions. I also concur in the majority's decision to affirm appellant's death sentence for the aggravated murder of Leneshia Williams, as charged in Count Two. However, I dissent from the majority's decision to vacate the death sentence as to Count One, the aggravated murder of Jayla Grant. Believing that the trial court's denial of appellant's request to inform the prospective jurors of Jayla Grant's age did not fundamentally impair appellant's right to an impartial jury, I would affirm the death sentence as to Count One as well.

{¶ 180} A criminal defendant is not always constitutionally entitled "to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him." *Ristaino v. Ross* (1976), 424 U.S. 589, 594, 96 S.Ct. 1017, 47 L.Ed.2d 258, citing *Ham v. South Carolina* (1973), 409 U.S. 524, 527–528, 93 S.Ct. 848, 35 L.Ed.2d 46. Even when the criminal conduct at issue involves allegations of racial or ethnic bias, the United States Supreme Court has declined to adopt a rule requiring trial courts to inquire into such bias in every case. *Rosales–Lopez v. United States* (1981), 451 U.S. 182, 190, 101 S.Ct. 1629, 68 L.Ed.2d 22, citing *Ristaino*. See, also, *United States v. Lancaster* (C.A.4, 1996), 96 F.3d 734, 742 (holding that a per se rule requiring courts to allow defense counsel to ask prospective jurors whether they would be biased in favor of law-enforcement witnesses offends the deference traditionally accorded the trial court's conduct of voir dire). Cf. *Turner v. Murray* (1986), 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (holding that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias").

{¶ 181} Furthermore, as the majority recognizes, this court accords considerable deference to a trial court's decisions regarding the scope of voir dire, which rests within the discretion of the trial judge and varies in each case. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40, citing *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. Unless a defendant can establish a clear abuse of discretion, no prejudicial error will be found in a trial court's qualification of venirepersons. Id.; *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674; *State v. Ellis* (1918), 98 Ohio St. 21, 120 N.E. 218, paragraph one of the syllabus. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 182} As the Supreme Court explained in *Ristaino*, because voir dire is conducted under the supervision of the trial court, a great deal must, of necessity, be left to its sound discretion. Id. at 594, 96 S.Ct. 1017, 47 L.Ed.2d 258. "This is so because the 'determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge.'" Id. at 594–595, 96 S.Ct. 1017, 47 L.Ed.2d 258, quoting *Rideau v. Louisiana* (1963), 373 U.S. 723, 733, 83 S.Ct. 1417, 10 L.Ed.2d 663 (Clark, J., dissenting).

{¶ 183} A specific voir dire question is constitutionally required only when the trial court's refusal to allow the question would render the defendant's trial fundamentally unfair. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 425–426, 111 S.Ct. 1899, 114 L.Ed.2d 493. A claim such as the one appellant makes asserting that a jury was not impartial must focus on the jurors who ultimately sat. *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144, citing *Ross v. Oklahoma* (1988), 487 U.S. 81, 86, 108 S.Ct. 2273, 101 L.Ed.2d 80; *State v. Broom* (1988), 40 Ohio St.3d 277, 288, 533 N.E.2d 682.

{¶ 184} I would find that the trial court took effective steps to qualify the jurors. The trial court conducted an extensive, sequestered voir dire, during which prospective jurors were individually questioned about their views on the death penalty and their exposure to pretrial publicity. Defense counsel were given extensive leeway to question prospective jurors on a variety of topics.

{¶ 185} Furthermore, the trial court did not merely permit defense counsel to ask generalized questions of fairness and impartiality. Cf. *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (in which the United States Supreme Court reversed a death sentence because the trial court had refused to ask prospective jurors whether they would automatically impose a death sentence if they found the defendant guilty). The trial court in this case allowed questions covering specific topics aimed at determining prospective jurors' views on imposing the death penalty and exposing those jurors who would automatically choose

death upon a conviction of a capital offense. *Morgan* requires nothing more. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292 (construing *Morgan*).

{¶ 186} My review of the record convinces me that appellant's voir dire of the jury was not unduly limited and that voir dire resulted in a fair and impartial jury. Every juror seated indicated that he or she would not automatically vote for the death penalty upon a finding of guilt, that he or she would fairly consider mitigating evidence and life-sentencing options, and that he or she would follow the court's instructions on the law.

{¶ 187} I believe that these considerations outweigh any possible prejudice that may have occurred from the trial court's denial of appellant's request that voir dire focus specifically on the age of Jayla Grant. I would find that appellant has not shown that he was deprived of his right to an unbiased jury. Accordingly, I dissent in part and would affirm the convictions and sentences in all respects.

---

David E. Bowers, Allen County Prosecuting Attorney, and Jana E. Gutman, Assistant Prosecuting Attorney, for appellee.

David C. Stebbins and Angela Miller, for appellant.