[Cite as *State v. Manley*, 2017-Ohio-8271.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY


STATE OF OHIO,

        CASE NO.  1-17-06

    PLAINTIFF-APPELLEE,

    v.

JOHN L. MANLEY,                 O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Trial Court No. CR 2015 0427

Judgment Affirmed

Date of Decision:  October 23, 2017


APPEARANCES:

    *F. Stephen Chamberlain* for Appellant

    *Jana E. Emerick* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, John Manley ("Manley"), brings this appeal from the January 10, 2017, judgment of the Allen County Common Pleas Court sentencing Manley to serve 16 months in prison after he was convicted by a jury of Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree. On appeal, Manley argues that he received ineffective assistance of counsel, that his conviction was not supported by sufficient evidence, and that his conviction was against the manifest weight of the evidence.

*Procedural History*

{¶2} On December 17, 2015, Manley was indicted for one count of Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), a felony of the fourth degree. Manley pled not guilty to the charge, and his case proceeded to a jury trial. Manley was ultimately convicted and on January 10, 2017, he was sentenced to serve 16 months in prison. It is from this judgment that Manley appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The Defendant was deprived of his right to a fair trial due to the ineffective assistance of counsel.**

**Assignment of Error No. 2**
**The conviction of the Defendant was against the manifest weight of the evidence and was based upon insufficient evidence.**

**{¶3}** We elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

**{¶4}** In his second assignment of error, Manley argues that his conviction was not supported by sufficient evidence, and that his conviction was against the manifest weight of the evidence.

Relevant Authority

**{¶5}** Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id*. When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶6}** By contrast, in reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the

evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Furthermore, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required. *Thompkins* at paragraph 4 of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3).

**{¶7}** In this case, Manley was convicted of Gross Sexual Imposition in violation of R.C. 2907.05(A)(1), which reads, "No person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he offender purposely compels the other person * * * to submit by force or threat of force."

Evidence Presented by the State

**{¶8}** At trial the State called seven witnesses including the victim, S.J., who was 27 years old and the mother of four children. S.J. testified that she initially met Manley at a local bar when S.J. was out with a female friend. S.J. testified that Manley approached her at the bar, romantically, and S.J. lied to Manley at the time and told him that the female S.J. was with was actually her girlfriend, which was not the case.

**{¶9}** S.J. testified that she later came into contact with Manley again when she was looking for a house to rent for herself, her boyfriend, and her four children. She testified that she saw a home for rent on Cedar Street in Lima and called the

-4-

number listed and the landlord happened to be Manley. The Cedar Street home was too small for S.J., but Manley had another home for rent that was more suitable, which S.J. decided to rent.

{¶10} S.J. testified that after moving into the residence, she eventually became uncomfortable dealing with Manley, so she asked her boyfriend to deal with him regarding the rent. S.J. indicated that Manley would occasionally send her text messages, but she eventually changed her number.[1] S.J. testified that after she changed her number, Manley showed up unannounced at her place of employment. S.J. testified that Manley made her uncomfortable, so she made an excuse to get him to leave, telling Manley that cameras were there and she could get into trouble.

{¶11} As to the incident in question, S.J. testified that on October 19, 2015, around 11 or 11:30 a.m. she was at her residence alone when Manley came in. S.J. then testified as follows.

> * * * My front door was open, but we had a screen door. He came and said that he had to talk to me. He walked in the house. I was sitting on the edge of my couch * * *[.] When he walked in I felt uncomfortable, but he started telling me about what him and Anthony, which was my boyfriend, had talked about the day before about rent, which I already knew about. I told him I knew about it so he would cut the story short. He ended up shutting the door behind him and locking it. He walked over to me and stood above me and kept saying, he said that I knew he was trying to get on with me for a long time. He began rubbing himself through his pants and then was trying to grab my hand to touch him. I was trying to pull away and so then he pulled it out and put my

---

[1] It is not clear to what extent, if any, S.J. changed her number specifically because of Manley.

**hand on his penis. He was trying to rub my hand on it. Then he – then he took my breast out of my shirt. I started to scoot. I have a sectional and I was trying to scoot this way because I had my phone and my knife in my bedroom.**

**Q [Prosecutor]: You had what in your bedroom?**

**A [S.J.]: A knife and my phone. I scooted around my sectional. I didn't want to make a big deal and start running. So, I was scooting and he continued to do it. Then when I got up he ended up corralling me in the corner and ejaculated on my floor, in front of me basically.**

(Tr. at 95-96).

{¶12} S.J. would clarify that Manley held her hand on his penis, that she tried to pull back, that she said no, and told him that she wanted him to go away. S.J. also testified that she was too scared to run, because she was afraid it would make it worse and she was scared of what Manley might do to her.

{¶13} S.J. testified that she "freaked out," and Manley could tell. S.J. testified that she kept saying to him that she had to go pick up her boyfriend's cousin so that Manley would leave. (Tr. at 104). S.J. testified that Manley pulled his pants up and walked out the front door, and that she quickly followed him out in case he changed his mind and wanted to come back inside. S.J. testified that she then did go to her boyfriend's cousin's house, who lived nearby.

{¶14} S.J. told her boyfriend's cousin what happened and got in touch with her boyfriend, who was at work. Then S.J. went to her sister's residence and told her what happened. S.J. went back to her residence with her sister, at which time

Manley returned to speak with S.J. Manley made an audio recording of that conversation, which was introduced at trial. On the recording, Manley asks why S.J. told Anthony that Manley had raped her. S.J. indicated that she never said "rape" specifically, but she said that Manley took it too far. Manley admitted on the audio recording that he might have taken it too far and he stated that he would not come at her again like that.

{¶15} Later that same evening, S.J. called the police and the police responded to her residence. S.J. was interviewed and the portion of her carpet where Manley had purportedly ejaculated was removed and seized for evidence. DNA was taken from S.J. and a swab was taken from a place on her neck where she said Manley had kissed her during the encounter.

{¶16} The substance on the carpet that was collected turned out to be semen and the State's expert testified that it was consistent with Manley's DNA. Further, DNA consistent with Manley was found on S.J.'s neck.

{¶17} Along with S.J., the State called multiple officers to testify who were involved in responding to the scene, collecting evidence, and investigating the crime. The State presented expert testimony from BCI linking the DNA evidence to Manley. The State also called S.J.'s sister, who testified as to what S.J. told her on the date of the incident and S.J.'s demeanor at the time.

## Sufficiency of the Evidence

{¶18} Manley argues that the preceding evidence presented by the State at trial was insufficient to convict him at trial of Gross Sexual Imposition. We disagree.

{¶19} Viewing the evidence in the light most favorable to the State, as we are directed, there is clearly testimony that Manley forced S.J.'s hand onto his penis and that he held it there, constituting both force and sexual contact. There was also clear testimony that S.J. was not, and never had been, the spouse of Manley. S.J. testified to additional sexual contact, such as Manley grabbing her breast. She also indicated that Manley "corralled" her in the corner. Based on this testimony, we cannot find that insufficient evidence was presented to convict Manley of Gross Sexual Imposition.

## Defense Case

{¶20} Manley took the stand in his own defense. Manley contended that from the first meeting he had with S.J. at a local bar he and S.J. had started a sexual relationship. Manley contended that one night he went to S.J.'s work and she performed oral sex on him and that they then had sexual intercourse the next day at the empty house on Cedar Street that S.J. had originally looked at to rent. As to the incident in question, Manley testified that S.J. had consensually performed oral sex

on him, and that they were interrupted when someone knocked at the door. Manley testified that he and S.J. then got into an argument, at which point he left.

{¶21} Manley testified that later on the date of the alleged incident, he received a message from S.J.'s boyfriend accusing Manley of raping S.J. Manley testified that he then went back to S.J.'s residence and had a conversation with her and her sister, which he recorded, asking why S.J. had accused him of rape. Manley testified that the reason why he said on the recording that he had taken it "too far" was because he had yelled at S.J. after the consensual sexual encounter. Manley adamantly denied forcing any type of sexual contact upon S.J., claiming that the two had been engaged in an on-again, off-again affair since they had met.

{¶22} A friend of Manley's also testified at trial. She testified that S.J. had a reputation for being an untruthful person.

### State's Rebuttal

{¶23} The State recalled its detective on rebuttal and played a recording of Manley speaking with S.J.'s boyfriend shortly after the purported incident. On the tape, Manley repeatedly denies having any kind of current sexual relationship with S.J.

### Manifest Weight of the Evidence

{¶24} Manley argues that even if there was sufficient evidence to convict him, his conviction was against the manifest weight of the evidence. We disagree.

{¶25} The jury in this case was able to see and hear the testimony of both S.J. and Manley and weigh their credibility. While Manley may argue that S.J. was lying and that she was not credible, the jury elected to believe her. The jury also elected not to believe Manley's explanation regarding why he had said on his own recording that he took things too far.

{¶26} Moreover, Manley may claim that his counsel failed to investigate certain items that would help prove his innocence, but the jury heard Manley's testimony that a consensual relationship existed and the jury did not believe it. Based on the record before us and the testimony presented we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice. Therefore, Manley's second assignment of error is overruled.

*First Assignment of Error*

{¶27} In his first assignment of error, Manley argues that he received ineffective assistance of trial counsel. Specifically, Manley argues that his attorney was unfamiliar with the rape shield law, that his attorney failed to "grasp [] hearsay rules that are basic and fundamental[,]" that his attorney failed to properly impeach a witness, and that trial counsel failed to adequately investigate certain evidence that Manley feels would have shown that he was innocent.

## Standard of Review

{¶28} To establish an ineffective assistance of counsel claim, Manley must show that his trial counsel's performance was deficient and that counsel's performance prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

## Analysis

{¶29} Manley first argues that his counsel was somehow deficient because the *prosecutor* initially misstated the rape shield law. At the time of the conversation regarding the rape shield law, the parties were discussing whether specific instances of sexual activity between Manley and the victim could be introduced into evidence. The prosecutor initially indicated that such testimony would be improper; however, the prosecutor later admitted to misreading the rule. Thus, any misstatement that such testimony was inadmissible was later corrected, and defense counsel did, in fact, introduce testimony of a prior purported sexual history between Manley and S.J. Therefore, Manley's arguments are not supported,

and not well-taken. Similarly, Manley's claim that his trial counsel did not have a "basic grasp" of hearsay rules is unsupported in his brief by any record citations to illustrate how this alleged failure prejudiced him. We find no merit to this argument.

**{¶30}** Manley next argues that his trial counsel was ineffective for failing to introduce extrinsic evidence of a prior inconsistent statement of the victim. He cites no specific instance in the record to support his contention, just arguing generally that trial counsel failed to properly introduce relevant prior inconsistent statements that this Court has no knowledge of actually existing. Notably, at least one of S.J.'s purportedly prior inconsistent statements was talked about at length by the parties and the trial court ruled that the prior inconsistent statement was related to an inconsequential issue and thus was not admissible at trial. Defense Counsel argued repeatedly that it was an issue of consequence, thus we fail to see how counsel could have been ineffective for making his arguments simply because he did not prevail, particularly given that the extrinsic evidence would have been used to discount an irrelevant issue.

**{¶31}** Manley also argues that his trial counsel was ineffective for failing to acquire any text messages or phone records between S.J. and the defendant. First, we have no knowledge as an appellate court that such records exist at all, let alone contain *anything* favorable to Manley. In order to find ineffective assistance of counsel, we would have to speculate that the records existed, that they were

favorable to Manley *and* that they were so favorable that counsel was ineffective for failing to present them. There are mechanisms to present newly discovered evidence via post-conviction procedures. Inviting an appellate court to speculate about hypothetical material is not proper grounds for reversal under ineffective assistance of counsel.

**{¶32}** Finally, Manley makes a similar argument claiming that his counsel was ineffective for failing to get a blanket tested for DNA. Manley claims that he and S.J. had intercourse on a certain blanket in an otherwise empty house on Cedar Street long before the incident in question. Manley apparently gave the blanket to the police after this case was filed to be tested for DNA.

**{¶33}** The blanket at issue came up at trial, where Manley repeatedly said he did not know why it was not tested because it would show that an ongoing sexual relationship occurred. However, in the State's rebuttal case, the detective investigating the case indicated that when S.J. moved out of the residence Manley owned, she left a number of items behind, which included various articles of clothing, and Manley eventually received access to that residence. Thus the State insinuated that Manley had access to clothes and (potentially) blankets from the residence that may have contained S.J.'s DNA.

**{¶34}** Assessing Manley's argument, he again invites this court to speculate that the DNA on the blanket, if tested, would support his story and that there were

not alternative explanations for it such as the one provided by the State at trial. We decline to engage in such speculation. Given that there is no actual indication in the record that evidence favorable to Manley truly existed, we can find neither that counsel's performance was deficient nor that any deficient performance was prejudicial. Therefore, Manley's first assignment of error is overruled.

*Conclusion*

{¶35} For the foregoing reasons Manley's assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON, P.J. and ZIMMERMAN, J., concur.**

**/jlr**