[Cite as *State v. Hawkins*, 2021-Ohio-1484.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 109452 |
| v. | : | |
| MARCUS HAWKINS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 29, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-627538-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Katherine E. Mullin, Assistant Prosecuting Attorney, *for appellee.*

Stephen L. Miles, *for appellant.*

SEAN C. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Markus Hawkins appeals his convictions following a jury trial. Upon review, we affirm.

**Background**

{¶ 2} On April 6, 2018, appellant was indicted for offenses related to the death of the victim, I.P., that occurred on or about December 18, 2016. Appellant was charged with three counts of aggravated murder, one count of murder, two counts of felonious assault, two counts of aggravated burglary, and one count of kidnapping.

{¶ 3} The case proceeded to a jury trial. The testimony and evidence showed that the victim was stabbed to death, she sustained multiple wounds, her three children were home when the murder occurred, and appellant was implicated as the offender.

{¶ 4} The victim's sister, M.C., testified that the victim and appellant had ended a relationship a couple of months prior to her death. M.C. testified to an incident when appellant showed up at the victim's house and appeared to have been spying on the victim. She also testified that the victim was talking about appellant the night before she was killed.

{¶ 5} The victim's three children, Q.D. Jr., X.D., and I.D., were in the home when their mother was killed. At the time of their mother's death, I.D. was almost 7 years old, X.D. was 10 years old, and Q.D. Jr. was 11 years old.

{¶ 6} Q.D. Jr. testified that on the night of his mother's death, he and his siblings were staying at their mother's house. He testified that he and I.D. were living with their mother and X.D. lived with their father, but they would stay with either parent at times. On the night of their mother's death, all three children were

at their mother's house and their father was working. Q.D. Jr. testified that his mom told him to go to bed around 12:00 a.m. and that X.D. was asleep before he was. He testified that his mother and I.D. were in the living room watching television together. Q.D. Jr. woke up and heard his mother screaming "call 9-1-1" and heard his mother banging on her bedroom door from inside her bedroom. He testified that he heard his mom screaming, "Markus please stop. You don't have to do this." He also heard a gargling sound, he heard a window break, and then there was silence. He was unable to get into his mother's room and used a smartwatch to call his father. Q.D. Jr. testified that when his father arrived, his father used a key to get into the house, checked on the children, and broke down the door to their mother's bedroom, which was locked. Q.D. Jr. saw his mom on the floor. He identified appellant in court as "Markus." He testified he had met appellant four or five times before the night of his mother's death.

{¶ 7} X.D. testified that Q.D. Jr. woke him up and asked if he could call their father from his watch. X.D. testified that Q.D. Jr. called their father, who was at work, and that Q.D. Jr. seemed scared of something. When their father arrived, he checked on the children and then broke down their mother's bedroom door. X.D. saw his mother lying on the floor. X.D. testified that he does not know appellant. However, X.D. testified that he lived with his father a lot during this time and that there were times his brother and sister stayed with their mother when he was staying with their father.

{¶ 8} I.D. testified that on the night her mother was killed, appellant was in her house, but her mother did not let appellant into the house. I.D. testified that she saw appellant with her mother by her mother's bedroom door and that her mother looked nervous. I.D. testified that she turned to watch television and soon heard her mother screaming to "call 9-1-1." I.D. testified that suddenly "it just went silent." I.D. testified that they could not open the door to their mother's room and that they called their father and waited for him to arrive. She identified appellant in court as "Markus" and as the man she saw by her mother's room the night her mother died. She testified she had met appellant four or five times before the night of her mother's death.

{¶ 9} Q.D. Sr., who is the children's father, testified that his relationship with the victim ended a year or two before she was killed and that they were on good terms. He testified that on the night the victim was killed, he was at work and received phone calls from Q.D. Jr., who sounded worried and concerned. The first call was around 1:30/1:45 a.m. Q.D. Sr. testified he did not go to the victim's house immediately because he was worried that he could lose his job. He clocked out at 2:48 a.m., after receiving a second call from Q.D. Jr. When Q.D. Sr. arrived at the victim's home, he entered with a key he possessed. He checked on the children and knocked on the locked door to the victim's bedroom, but he did not get a response. He broke into the victim's bedroom and found her lying face down and unresponsive. The children were behind him yelling "mommy." He noticed a broken window in the room.

{¶ 10} At 3:09 a.m., 911 was called from the victim's home. A responding officer described a gruesome scene, observed the bedroom window was broken out, and testified that the children were distraught. The police found a bloody knife outside the bedroom window and observed footprints in the snow. Body camera footage was introduced. Q.D. Sr. cooperated with the police, and his whereabouts that night were confirmed by his employer. From their investigation at the scene, the police determined appellant was a suspect.

{¶ 11} A friend of appellant, R.T., testified that on the night of the victim's murder, he received a call from appellant and that he picked up appellant at appellant's mother's house. R.T. observed appellant came from around back and was wearing a "stringy" backpack when he got in the car. R.T. testified that when they got to his apartment, appellant asked where the garbage can was to throw food away, and R.T. directed appellant to a garbage can in the parking lot where the dumpsters were located. R.T. did not see the backpack when appellant came inside his house, and he did not see it in his car the next morning. When R.T. woke up the next day, appellant was gone. Appellant's brother called R.T. and asked what time and where he had picked up appellant. R.T. also testified that a bag depicted in a photograph at trial was not the same bag that he observed appellant wearing.

{¶ 12} Appellant's stepfather testified that appellant was at home the night of the homicide and that the smoke detector was going off around 2:45 a.m. from appellant making hot dogs. Appellant's mother testified that on the night of the homicide, appellant came home around 12:45 a.m., they talked for a while, and

appellant cooked hot dogs. Appellant's mother conceded on cross-examination that after appellant's arrest, she never called the police to say appellant was with her that night.

{¶ 13} Testimony was provided about the forensic investigation and DNA analysis was done in the case. None of this evidence was linked to appellant. There was a hair strand found on the victim's shirt that was linked to another male, Z.B.

{¶ 14} Z.B. testified that he was friends with the victim, that she braided his hair at her house in the living room days before she died, and that they were still friends at the time of her death. Z.B. had previously been convicted of domestic violence and attempted felonious assault. He denied killing the victim. There was no evidence as to Z.B.'s whereabouts on the night of the victim's murder.

{¶ 15} Q.D. Sr. testified that the victim braided people's hair as a hobby. Q.D. Jr. testified that he remembered Z.B. getting his hair braided in the living room by his mom the week before his mom died. I.D. testified that Z.B. was not in the house the night her mom died, and she confirmed appellant was the person she saw by her mother's room before she died.

{¶ 16} Evidence showed that in the days before the murder, there was a thread of messages on Facebook between appellant and the victim in which the victim expressed to appellant, among other things, that "I'm over you," "I'm with someone that makes me happy," "[w]e could never be together again or friends," and "I hate your guts to the core." Cell phone records were introduced that placed

appellant near the victim's house at 12:09 a.m., near his mother's house at 3:39 a.m., and near R.T.'s house at 5:37 a.m.

{¶ 17} An undercover investigator on the case, who was posing as a friend of a confidential informant, testified she visited appellant in jail and he held up a piece of paper with three different questions he asked the investigator. The handwritten questions he asked were as follows: "He told you the whole story," "Well, I need you for my alibi," and "Sign language the phone number." Video and audio devices were used by the investigator.

{¶ 18} Other testimony and evidence were introduced at trial. The trial court granted a Crim.R. 29 motion as to Count 1 for aggravated murder in violation of R.C. 2903.01(A). The jury found appellant guilty of all remaining counts. The trial court sentenced appellant to a term of life with parole eligibility after 20 years on Count 3 for aggravated murder in violation of R.C. 2903.01(B), and to three years on Count 7 for aggravated burglary in violation of R.C. 2911.11(A)(1) to be served concurrently with Count 3. All remaining counts were subject to merger.

{¶ 19} Appellant timely filed this appeal.

**Law and Analysis**

{¶ 20} Appellant raises three assignments of error for our review. Under his first assignment of error, appellant claims the trial court erred by not declaring a mistrial due to prosecutorial misconduct.

{¶ 21} "The decision to grant or deny a mistrial lies in the trial court's sound discretion, and the court should grant one only when justice requires and a fair trial

is no longer possible." *State v. Madison*, Slip Opinion No. 2020-Ohio-3735, ¶ 196, citing *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 89. The relevant question in reviewing a claim of prosecutorial misconduct is "'whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" *State v. Froman*, Slip Opinion No. 2020-Ohio-4523, ¶ 114, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In answering that question, the reviewing court considers "whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *Id.*, citing *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In evaluating prejudice, the court considers "the effect that the misconduct had 'on the jury in the context of the entire trial.'" *Id.*, quoting *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 22} In this case, appellant moved for a mistrial during the state's rebuttal to defense counsel's closing argument. Appellant claims that the state committed prosecutorial misconduct during closing arguments by commenting repeatedly on the moral character of defense counsel. Specifically, he contends the state (1) insinuated defense counsel committed constant efforts to thwart justice, (2) claimed defense counsel misled the jury regarding DNA testimony, and (3) claimed appellant should have called witnesses regarding eyewitness identification.

{¶ 23} Our review reflects that during closing argument, defense counsel challenged the credibility of the children and the lack of DNA evidence linking appellant to the homicide. In rebuttal, the assistant prosecutor indicated that he wished he could cross-examine defense counsel concerning his thoughts on DNA testimony and stated defense counsel could have called an expert on eyewitness identification. The trial court sustained an objection. As the Supreme Court of Ohio has recognized: "'[T]he state may comment upon a defendant's failure to offer evidence in support of its case. * * * Such comments do not imply that the burden of proof has shifted to the defense * * *.'" *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 122, quoting *State v. Collins*, 89 Ohio St.3d 524, 527-528, 733 N.E.2d 1118 (2000).

{¶ 24} Also, during closing argument, defense counsel insinuated that after three years, the state had "nothing to corroborate their case" and was relying on the observations of a six-year-old child to establish identification in the case. Defense counsel questioned I.D.'s perception of what was really happening by referring to her testimony that X.D. told her he saw a knife in appellant's pocket and by noting other testimony in the case that discredited this statement was made by X.D. In rebuttal, the assistant prosecutor questioned defense counsel's attempt to "impeach one with something that another one may have [seen]" and stated "How many times did you hear that they were talked to? One line. They have been oaks and he knows it[.]" Thereupon, an objection was made that the trial court sustained. The assistant prosecutor reiterated that the children "have been consistent." The Supreme Court

of Ohio has stated that although it is improper for a prosecutor to express his personal belief or opinion about the credibility of a witness, a prosecutor is permitted to respond to defense counsel's attacks on a witness's credibility and refer to facts in evidence that tend to make the witness more credible. *State v. Graham*, Slip Opinion No. 2020-Ohio-6700, ¶ 96-99, citing *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 120.

{¶ 25} The assistant prosecutor also stated, "Three years and it continues to this day. On Monday we get a picture of a bag, right? Constant efforts to thwart justice. Constant." The assistant prosecutor was commenting on the defense producing a picture of a different bag than the one appellant was described as wearing on the night of the victim's murder. Another objection was made by defense counsel. The assistant prosecutor went on to note that the defense attorneys "are literally two of the best we have in this county." As the Supreme Court of Ohio has stated, "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 86.

{¶ 26} Defense counsel moved for a mistrial during a sidebar discussion, and the trial court denied the motion. When providing the jury instruction, the trial court instructed the jury that "opening statements and closing arguments do not constitute evidence in this case and they shall not be considered as evidence by the jury."

{¶ 27} In general, a prosecutor has considerable latitude in his closing argument, and the prosecutor's conduct during closing argument "must be considered in light of the entire case to determine whether the accused was denied a fair trial." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149, citing *State v. Maurer*, 15 Ohio St.3d 239, 266, 269, 473 N.E.2d 768 (1984). In this matter, to the extent the assistant prosecutor made any improper comments during closing argument, we do not find, in the context of the entire trial, that these comments prejudicially affected appellant's substantial rights and deprived him of a fair trial. We find the trial court did not abuse its discretion in denying the motion for a mistrial. The first assignment of error is overruled.

{¶ 28} Under the second assignment of error, appellant argues that the convictions were against the manifest weight of the evidence. He challenges the lack of DNA and fingerprint evidence or any other physical evidence to connect him to the scene of the homicide. He also challenges the credibility of the children's testimony and points to contradictions in their testimony.

{¶ 29} When reviewing a claim challenging the manifest weight of the evidence, the court, reviewing the entire record, must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st

Dist.1983). When a court of appeals concludes that a verdict is against the weight of the evidence, "the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* "An appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal." *Id.* at 388. A judgment of conviction should be reversed as against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* at 387, citing *Martin* at 175.

{¶ 30} "[A] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence." *State v. Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 32, citing *State v. Payne*, 8th Dist. Cuyahoga No. 105965, 2018-Ohio-1399, ¶ 30; *see also State v. Flores-Santiago,* 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 37-38. In this case, the testimony and evidence showed that the assailant was not invited into the home, that he locked the victim in her bedroom, and that he stabbed her to death. There was eyewitness testimony identifying appellant as the offender. Additionally, circumstantial evidence was introduced that implicated appellant.

{¶ 31} Two of the children heard their mother screaming to call 911. I.D. was an eyewitness who testified that she saw appellant standing by the bedroom door with their mother. I.D. also testified she had met appellant four or five times before, he was not let into the house, he was saying something to her mother, and her mother did not look happy to see him. I.D. testified she turned her head to watch

television and heard her mother screaming to "call 9-1-1." Q.D. Jr. also testified that he had met appellant four or five times before and that he heard his mother scream "Markus please stop. You don't have to do this." Both I.D. and Q.D. Jr. identified appellant as "Markus" at trial.

{¶ 32} While there were some discrepancies in the testimony, the children's accounts of what happened that night were credible. Even where discrepancies exist, eyewitness identification testimony alone has been found sufficient to support a conviction, so long as a reasonable juror could find the eyewitness testimony credible. *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12, citing *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 52. Also, the excited utterance made by the victim has a high level of reliability. *See State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993); *see also* Staff Note to Evid.R. 803(2).

{¶ 33} The testimony and evidence also showed that the children's father, Q.D. Sr. was at work, he was called by Q.D. Jr., and he entered the victim's home with a key when he arrived. Information provided to the police led them to believe appellant was a suspect. Z.B., whose hair was found on the victim's shirt, testified that the victim braided his hair days before the homicide, which was corroborated, and that he did not murder the victim.

{¶ 34} Although appellant's parents testified that he was at home on the night of the homicide, R.T. testified that he picked appellant up at his mother's home and that appellant had a "stringy" backpack that he did not see again. Also, cell

phone records were introduced placing appellant near the scene of the crime, followed by his mother's home, and then near R.T.'s apartment. Further, evidence was introduced showing that appellant and the victim had ended a relationship a couple of months before the homicide and that Facebook messages were exchanged between them in the days before her death.

{¶ 35} Additionally, the undercover investigator testified that appellant solicited her to be an alibi. "Trying to create a false alibi 'strongly indicates consciousness of guilt.'" *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001), quoting *State v. Campbell*, 69 Ohio St.3d 38, 47, 630 N.E.2d 339 (1994). Consciousness of guilt may also be inferred from lies told by an accused. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 54.

{¶ 36} After reviewing the entire record, weighing all reasonable inferences drawn therefrom, and considering the credibility of the witnesses, we conclude that appellant's convictions were not against the manifest weight of the evidence. Accordingly, we overrule the second assignment of error.

{¶ 37} Under the third assignment of error, appellant claims his convictions were not supported by sufficient evidence. "Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 560 (1979).

{¶ 38} Appellant was sentenced on Count 3 for aggravated murder in violation of R.C. 2903.01(B), and on Count 7 for aggravated burglary in violation of R.C. 2911.11(A)(1). The remaining counts on which he was found guilty were subject to merger. Insofar as certain counts were subject to merger, we need not consider the sufficiency of the evidence on a count that is subject to merger because any error would be harmless. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990).

{¶ 39} Under his sufficiency challenge, appellant argues there was a lack of physical evidence to corroborate his identity as the person who committed the offenses. Although there was a lack of DNA and fingerprint evidence connecting appellant to the scene of the crimes, our review reflects that the eyewitness identification testimony and circumstantial evidence in the case were sufficient to support the convictions.

{¶ 40} The state presented testimony that showed appellant was not invited into the home before the murder, I.D. observed appellant standing with her mother, who appeared nervous, outside the bedroom door just before she was murdered, I.D. and Q.D. Jr. heard their mother screaming to call 911, and Q.D. Jr. heard his mother identify appellant as the assailant. The testimony and evidence further

showed that the victim was locked in the bedroom, the assailant broke the bedroom window, and Q.D. Sr. had to break the bedroom door to enter the room. Other evidence was introduced to support the convictions, including testimony from the police about the investigation, testimony from R.T. concerning appellant's whereabouts and the "stringy" backpack, cell phone records showing appellant's approximate location on the night of the victim's murder, testimony from the undercover investigator about appellant soliciting her to be an alibi, along with other testimony and evidence in the case.

{¶ 41} After viewing the evidence in a light most favorable to the prosecution, we find any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Accordingly, we overrule the third assignment of error.

{¶ 42} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EMANUELLA D. GROVES, J., CONCUR